842 P.2d 660

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Jose GUZMAN, Defendant–Appellant.**

**No. 17716.**

Supreme Court of Idaho,
Twin Falls, November 1991 Term.

Nov. 5, 1992.

Michael J. Wood, Twin Falls County Public Defender, Twin Falls, for appellant.

Larry EchoHawk, Atty. Gen., and Michael J. Kane, Deputy Atty. Gen., Boise, for respondent. Michael J. Kane argued.

BISTLINE, Justice.

## PROLOGUE: UNDERLYING FACTUAL CIRCUMSTANCES

In this appeal we are asked to review the district court's application of the good faith exception to the probable cause requirement contained in art. 1, § 17 of the Idaho Constitution, and the court's refusal to order the State to disclose the identity of a paid confidential informant. For the reasons stated in this opinion, we apply the exclusionary rule which has evolved under our state constitutional jurisprudence and accordingly reverse the district court's refusal to suppress the evidence which was obtained pursuant to an invalid search warrant. Our resolution of that issue moots the further issue relative to defendant's contention that the trial court should have ordered the State to disclose the name of the informant.

We begin our discussion with a review of the facts. Detective Ronald Axtman of the Twin Falls Police Department was supervising the paid informant. On February 23, 1987, the informant contacted Detective Axtman and stated that approximately 200 pounds of marijuana was being kept at a home on Gulch Lane in Twin Falls. The informant also stated that Jose Guzman had transported the marijuana from Arizona to Idaho. Detective Axtman took no

action on the basis of this first call, other than to request the criminal history of Guzman from authorities in Arizona. During a second call from the informant, on February 26, 1987, the informant told Detective Axtman that approximately 100 pounds of marijuana remained at the Gulch Lane home. Following the second phone call, Axtman, along with another detective, went within a few hundred yards of the Gulch Lane residence to conduct surveillance. During this stakeout, Axtman saw a person fitting the general description of Guzman at the Gulch Lane residence. Axtman returned to his office and prepared an affidavit in support of a search warrant of the house and its outbuildings.

Axtman applied to Judge Edwards for a search warrant without having first consulted anyone in the office of the prosecuting attorney. On Judge Edwards asking Axtman how it was that the informant knew the substance in the Gulch Lane home was marijuana, Axtman replied that the informant was familiar with the texture, coloring and other properties of marijuana, and Axtman made an additional entry by hand onto his affidavit to reflect this statement to the magistrate. The warrant was executed in the afternoon of February 26, 1987. Approximately thirty-six pounds of marijuana was found inside a locked freezer. The freezer was located in an outbuilding on the yard of the Gulch Lane residence. Guzman was found in the outbuilding, and at that time admitted possession of the marijuana.

Guzman was charged on February 27, 1987, with possession of marijuana in excess of three ounces, and trial was set to begin May 12. The trial court issued three memorandum decisions and orders in response to preliminary motions made by the defense. The memorandum decision and order of July 30, 1987, denied Guzman's motion to suppress all of the evidence which was seized on executing of the warrant and also denied Guzman's motion to suppress statements made by him during and immediately after the search. A further decision on November 13, 1987, denied Guzman's motion requesting disclosure of the identity of the confidential informant.

Guzman had requested a *Leon* hearing, at which time the issues relevant to the *Leon* good faith exception could be explored. Thereafter, on January 18, 1988, the district court again denied Guzman's motion to suppress all of the evidence. The defendant entered a plea of guilty and received a determinate five year sentence. After serving 120 days the sentence was suspended, and Guzman was placed on probation for five years. This appeal followed.

## PART I. THE WARRANT WAS NOT SUPPORTED BY PROBABLE CAUSE.

■ The district court agreed with Guzman that the information included in Detective Axtman's affidavit in support of the search warrant was not complete. The affidavit did not disclose that: (a) the undisclosed informant was a paid informant; (b) two of the prior arrests and convictions, in which the undisclosed informant proved his reliability, occurred approximately eight years earlier; and, (c) the third arrest and conviction referred to in the affidavit was in fact a probation violation in which the informant did not provide wholly accurate information. However, the court held that these omissions in the affidavit amounted to only negligent falsehoods. According to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), adopted by this Court in *State v. Lindner*, 100 Idaho 37, 41, 592 P.2d 852, 856 (1979), "negligent or innocent misrepresentations, even if necessary to establish probable cause, will not invalidate a warrant."

■ Our Court of Appeals has heretofore held that the ruling in *Franks* should apply to the omission as well as the inclusion of information in affidavits:

At issue in the instant cases is whether *omission*, rather than *inclusion*, of certain information misled the magistrate. We can conceive of no cogent reason why *Franks* should not be extended to challenges to affidavits based on deliberate or reckless omissions of facts which might cause a seemingly straightforward affidavit to mislead the magistrate. The failure to inform a magistrate of a known exculpatory fact may be misleading, if not more misleading, than the

furnishing of false information in applying for a search warrant.

*State v. Beaty,* 118 Idaho 20, 24, 794 P.2d 290, 294 (Ct.App.1990) (emphasis in original). We concur in the analysis of the Court of Appeals.

■ In order to establish the invalidity of the warrant, Guzman had to prove by a preponderance of the evidence that Detective Axtman, the affiant, knowingly and intentionally, or recklessly, falsified or omitted information from his affidavit. *Lindner,* 100 Idaho at 41, 592 P.2d at 856. Our independent review of the record leads us to agree with the district court that, at most, Detective Axtman's failure to include the information in his affidavit amounted to a negligent misrepresentation. However, we add these words of caution. The fact that this warrant and supporting affidavit survived a *Franks* challenge does not mean that we will forget this instance if and when another such challenge of an affidavit sworn to by the same affiant comes before us. A long pattern or practice of negligent misrepresentation could be seen as an indication of a knowing and intentional intelligent omission or falsification of information.[1]

■ Although the district court ruled that the negligent falsehoods in the affidavit were insufficient to justify suppression of the evidence, it also concluded, under the "totality of the circumstances" test, that Judge Edwards did not have before him sufficient facts necessary to find probable cause and had abused his discretion in issuing the search warrant. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see State v. Lang,* 105 Idaho 683, 672 P.2d 561 (1983). We agree in both

respects. The affidavit in support of the search warrant offered practically no basis of knowledge from which the informant's statements could be independently tested. Instead, the affidavit offered only conclusory statements. As was written long ago for this Court by Justice Herman H. Taylor, an affidavit in support of a warrant must relate facts, not simply the conclusions that may be drawn from those facts:

[H]e who sits in judgment at the halfway station as to the existence of 'probable cause' must be the magistrate, and not the affiant who must bear the burden of facts up the mountain to that station, rather than his conclusions. He cannot leave at the foot of the mountain his load of facts, and with lightened and easy steps recite at the halfway station his conclusions as to facts which he does not choose to carry so far. The affiant's eyes, ears and other senses and powers are the mere instruments for securing and conveying to the magistrate the facts which these senses have observed and recorded, and his mind is not the place for the conclusion to be reached, but *the mind and brain of the magistrate must form and draw the conclusions from facts.*

*State v. Arregui,* 44 Idaho 43, 63, 254 P. 788, 794–95 (1927) (emphasis added).

## PART II. OUR PREVIOUS OPINION ADOPTING THE GOOD FAITH EXCEPTION TO THE EXCLUSIONARY RULE WAS BASED UPON AN UNSOUND RULE OF LAW, WHICH WE TODAY DISAVOW.

■ As noted above, the district court applied the "good faith" exception to the

---

1. In recent years, this Court has had occasion to consider other cases involving Detective Axtman, cases concerning warrants supported by affidavits sworn out by him in which he relied upon information supplied by a confidential informant, and issues concerning unlawful police conduct. *See State v. Diaz,* 117 Idaho 392, 788 P.2d 207 (1990); *Grant v. City of Twin Falls,* 113 Idaho 604, 746 P.2d 1063 (Ct.App. 1987); *Grant v. City of Twin Falls & Axtman & McDowell,* 120 Idaho 69, 813 P.2d 880 (1991) (same case as 113 Idaho 604). We do not suggest or intimate that, just because their names often appear in litigation alleging unlawful police conduct, some law enforcement officers,

perhaps motivated by zeal in the performance of duty, may on occasion abuse the limited powers vested in them by the laws and Constitution of Idaho. It is we hope reasonable to believe that such officers have learned from their mistakes. The narrow exceptions, *i.e.,* those carved out of the unforgiving rule that illegally seized evidence must be suppressed, are there to be used sparingly, and only when mistakes have been made. Mistakes must not become the practice instead of the exception. A court on observing that a pattern of mistakes has developed, on seeing yet another "mistake," might readily decide to view such circumstance with a jaundiced eye, and rule accordingly.

exclusionary rule, as announced in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and decided to admit the evidence despite the insufficiency of the affidavit in support of the warrant. This Court adopted the *Leon* good faith exception to the exclusionary rule in *State v. Prestwich*, 116 Idaho 959, 783 P.2d 298 (1989). The presentation of *Guzman* requires a reexamination of *Prestwich* and its conceptual underpinnings. In *Prestwich*, our opinion stated that:

> Preliminarily, we note that Prestwich has not questioned the applicability of *Leon* under the unreasonable search and seizure provision of our state constitution (article 1, § 17). We also note that our Court of Appeals has previously held that *Leon* is applicable under article 1, § 17. *State v. Rice*, 109 Idaho 985, 712 P.2d 686 (Ct.App.1985) *rev. denied* (1986). Although in *Prestwich II*[2] the Court of Appeals indicated that this Court has not yet addressed the applicability of *Leon* under our state constitution (109 Idaho at 989 n. 2, 712 P.2d at 690 n. 2), by *denial of review in Rice, this Court implicitly approved the application of Leon under article 1, § 17. Hays v. State*, 115 Idaho 315, 316, 766 P.2d 785, 786 (1988).

*Prestwich*, 116 Idaho at 960, 783 P.2d at 299 (emphasis added). Thus, without pausing to conduct an analysis of the merits, or lack thereof, of the *Leon* rule, *Prestwich* was deemed presumably adopted under the state constitution solely on the questionable basis of the effect of the Court's denial of a petition for review in *State v. Rice*, 109 Idaho 985, 712 P.2d 686 (Ct.App.1985), *rev. den.* (1986). This result was predicated in part in *Hays v. State*, which in turn adhered to an earlier opinion, *Nash v. Overholser*, 114 Idaho 461, 757 P.2d 1180 (1988) (Johnson, J. specially concurring, joined by Bistline and Huntley, JJ.). In *Nash*, Justice Johnson wrote that "[i]n my opinion, the result of the failure of this Court to grant a petition for review is that the decision of the Court of Appeals becomes the law of this state with regard to any new principles of law announced in the decision." *Nash*, 114 Idaho at 463–64, 757 P.2d at 1182–83.

The adoption of the good faith exception by applying the "review denied" rule was a matter of dispute in *Prestwich*, with only Justices Johnson and McDevitt in favor, and the Chief Justice concurring in the majority opinion, but adding in a special concurrence that the Court needed to reconsider its opinion in *State v. Hays*.[3] As to the part of Bistline, J., therein, it was pointed out that the listing of his name as concurring with Justice Johnson's specially concurring opinion in *Nash* was a clerical error, thus reducing the *Nash* opinion to a two justice vote. Justice Bistline did concur in the Court's adoption of the good faith exception, but did so only on the basis of "temporarily engaging" in the federal court's experiment, 116 Idaho at 966, 783 P.2d at 305, "notwithstanding the contrary and better reasoned views of Justices Brennan and Stevens [who authored dissents in *Leon* ]." 116 Idaho at 965, 783 P.2d at 304 (Bistline, J., concurring).

The time has arrived to reconsider "the rule of review denied" as suggested by the Chief Justice. We now explicitly reject the *Nash–Hays* review denied rule because of the problems such a rule creates. *See* T. Gresback, *Petition For Review Denied: What's All The Shouting About?*, The Idaho State Bar Advocate, Vol. 33, No. 2 (Feb. 1990). As that article makes clear:

> The problem is: Following the wake of *Nash*, how should the bench and bar apply the vast majority of Court of Appeals precedent in which no review was

---

**2.** The *Prestwich* case had been in the Court of Appeals two times before it reached this Court. *State v. Prestwich*, 110 Idaho 966, 719 P.2d 1226 (Ct.App.1986); *State v. Prestwich*, 115 Idaho 317, 766 P.2d 787 (Ct.App.1988). Unless otherwise indicated, when we refer to *Prestwich*, we refer to *State v. Prestwich*, 116 Idaho 959, 783 P.2d 298 (1989).

**3.** *State v. Prestwich*, 116 Idaho at 963, 783 P.2d at 302. Bakes, C.J., concurred and Justice Boyle stated his view that the *Leon* rule should be adopted on its own merits, "rather than upon this Court's failure to grant review in *State v. Rice*, ..." 116 Idaho at 966, 783 P.2d at 305 (Boyle, J., concurring).

sought? If denied review catapults announced principles into "the law of this state," it follows that the lack of review constitutes non-binding authority in Idaho. The logical extension of *Nash* thus undercuts the role of the Court of Appeals.

Gresback at 11.

In now disavowing any efficacy in the review denied rule we do so based on the reasoning of Chief Justice Bakes as set forth in his dissent in *Hays:*

> I believe it is an incorrect practice to hold that the denial of a review of a decision of the Court of Appeals based solely upon the presentation from one side, and then without the benefit of oral argument and conferencing, establishes a controlling precedent of this Court. Certainly there is nothing in I.A.R. 118 which requires, or even permits that result. No citation of authority is given for the action today and it is contrary to the practice in the Supreme Court of the United States and other states.... This Court does not have a summary disposition calendar, much less one which disposes of cases based upon briefs from only one side. The Court's decision ... will constitute a strong incentive for members of this Court to automatically vote to grant a petition for review in every case in order to prevent the precedent of this Court from being created by default.

115 Idaho at 317, 766 P.2d at 787 (Bakes, C.J., dissenting in part).

Whenever this Court entertains any doubt as to the validity of a new rule of law announced by the Court of Appeals, we make a considered decision whether to grant or deny review. Each member of the Court is furnished with the petition for review, the supporting briefs, and with the Court of Appeals's opinion. The briefs which the parties argued in the Court of Appeals are also available to us, as is the entire appeal record. To that extent, it can truthfully be said that we do not reach our decision to grant or deny review in a vacuum. There have been many instances when only two members of the Court voted to grant review, and also many instances where only one vote is cast to grant review. The various reasons for not granting review are not stated, but we have never considered that denying review meant any more than that for any one of various reasons there were not sufficient votes for reconsidering the decision of the Court of Appeals. One apparent reason for the rule of review denied was that, because we have considered an opinion in question and the briefs, an ensuing denial thereof puts our imprint upon the opinion. No one doubts the sincerity of those advocating that proposition, but the consensus of the Court is that such denial of review has no more meaning or effect than when the Supreme Court of the United States denies a petition for certiorari, the denial likely being attributable to the ever-increasing number of petitions. Of a necessity there must be a screening process.

As noted above, the underlying premise for the concept of the review denied rule was the statement in *Nash* that the failure of this Court to grant a petition for review results in the decision of the Court of Appeals becoming the law of this state with regard to any new principles of law announced therein. 114 Idaho at 463–64, 757 P.2d at 1182–83. None of us who formed the majority in *Nash* has ever disagreed with Justice Johnson's declaration that new principles of law announced by the Court of Appeals become precedential. The entire Court membership had the same understanding as *to the effect of a new principle of law announced by the Court of Appeals;* it becomes precedential law of this state, and all tribunals inferior to the Court of Appeals are obligated to abide by decisions issued by the Court of Appeals. To our knowledge, neither a district judge nor a trial judge has ever suggested not being bound by new principles of law, whether they emanate from this Court or from the Court of Appeals, but this Court has never subscribed to the view that our decision to not review a decision emanating from that court was tantamount to an implicit holding that the new case law precedent emanating from the Court of Appeals became somehow binding on this Court.

To this Court falls the obligation to be and remain the ultimate authority in fashioning, declaring, amending, and discarding rules, principles, and doctrines of precedential law by application of which the lower courts will fashion their decisions. This Court has been and remains the final arbiter of Idaho rules of law, both those promulgated and those evolving decisionally.

We reaffirm that the sole import of our determination to not review a Court of Appeals decision is as heretofore stated:

> Therefore, denial of review by this Court should carry no more weight than a denial of certiorari by the United States Supreme Court—such a denial 'means only that, for one' reason or another which is seldom disclosed, and not infrequently for conflicting reasons which may have nothing to do with any view of the merits taken by a majority of the Court, there were not four [three] members of the Court who thought the case should be heard.' *Daniels v. Allen*, 344 U.S. 443, 492, 73 S.Ct. 437, 439 [97 L.Ed. 469] (1953).

*State v. Prestwich*, 116 Idaho 959, 965, 783 P.2d 298, 304 (1989) (Bistline, J., specially concurring).

## PART III. ARTICLE 1, § 17 OF THE STATE CONSTITUTION IN SOME INSTANCES CONFERS BROADER PROTECTION AGAINST UNREASONABLE SEARCHES AND SEIZURES THAN DOES THE FOURTH AMENDMENT.

■ Having explained the unusual circumstances which were the genesis of *Prestwich*, we next reconsider our adoption of the *Leon* rule in light of the Idaho Constitution.

■ It is by now beyond dispute that this Court is free to interpret our state constitution as more protective of the rights of Idaho citizens than the United States Supreme Court's interpretation of the federal constitution. *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 80–82, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980) (Rehnquist, J.). In *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967), the Court wrote that its holdings do "not affect the state's power to impose higher standards on search and seizures than the federal Constitution if it chooses to do so." Justice Brennan's article, *State Constitutions and the Protections of Individual Rights*, 90 Harv.L.Rev. 489 (1977), helped to spark greater interest in independent state constitutional analysis. Evidence of this trend towards state constitutional analysis can be seen in the state supreme courts which have refused to adopt the "good-faith" exception under their own constitutions. *See, e.g., Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991); *State v. Oakes*, 598 A.2d 119 (Vt.1991); *State v. Marsala*, 216 Conn. 150, 579 A.2d 58 (1990); *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988); *State v. Novembrino*, 105 N.J. 95, 519 A.2d 820 (1987); *People v. Bigelow*, 66 N.Y.2d 417, 488 N.E.2d 451, 497 N.Y.S.2d 630 (1985); *see also Commonwealth v. Upton*, 394 Mass. 363, 476 N.E.2d 548 (1985) (rejecting rule on statutory grounds); *State v. McKnight*, 291 S.C. 110, 352 S.E.2d 471 (1987) (same). Additionally, some state courts of appeal have rejected the good faith exception under their respective state constitutions. *See, e.g., State v. Gutierrez*, 112 N.M. 774, 819 P.2d 1332 (Ct.App.1991); *People v. Sundling*, 153 Mich.App. 277, 395 N.W.2d 308 (1986).

As noted in part II, our Court of Appeals adopted the good faith exception in *State v. Rice*, 109 Idaho 985, 712 P.2d 686 (Ct.App. 1985). It did not do so because it was persuaded of the correctness of the *Leon* decision (to the contrary, in *State v. Schaffer*, 107 Idaho 812, 822, 693 P.2d 458, 478 (Ct.App.1984), it expressed serious reservations as to *Leon*), but rather because it believed itself so compelled by virtue of our decision in *State v. Cowen*, 104 Idaho 649, 662 P.2d 230 (1983):

> The appellant has requested that we construe the Idaho constitutional prohibition against unreasonable searches and seizures to exclude admission in evidence of the fruits of the search in this case, not withstanding that the evidence may be admissible under the federal Constitution. In *Schaffer* we expressed our ap-

prehensions about the federal rule announced in *Leon.* However, in light of our Supreme Court's admonition that the Idaho provision is to be construed consistently with the fourth amendment to the federal Constitution, *State v. Cowen,* 104 Idaho 649, 650, 662 P.2d 230, 231 (1983), we are constrained to decline Rice's request.

*State v. Rice,* 109 Idaho at 989, 712 P.2d at 690 (footnotes omitted).[4]

■ In *Cowen,* we did state "that the provision of Idaho Constitution, art. 1, § 17, prohibiting unreasonable searches and seizures, is to be construed consistently with the fourth amendment to the United States Constitution." 104 Idaho at 650, 662 P.2d at 231. However, we did not mean that the two provisions were identical in every respect because we went on to say that "[f]ederal law is therefore *instructive* on the issue [before the Court]." *Id.* (Emphasis added.) Although not artfully stated, *Cowen* stands for the proposition that we seriously consider federal law in determining the parameters of our own constitutional provisions, and we may adopt federal precedent under the state constitution but only to the extent that we believe the federal law is not inconsistent with the protections afforded by our state constitution.[5]

The Court has not taken the "construed consistently" language from *Cowen* to mean that the two constitutional provisions are co-extensive. For example, the Court stated in *State v. Henderson,* 114 Idaho 293, 299, 756 P.2d 1057, 1063 (1988), that "[t]he Idaho Constitution can, where appropriate, grant more protection than its federal counterpart." *Id.* In *State v. Thompson,* 114 Idaho 746, 760 P.2d 1162 (1988), we distinguished *Cowen* and declined to apply, under art. 1, § 17, a United States Supreme Court case interpreting the fourth amendment. We again stated that art. 1, § 17 of the state constitution may be read

independently from the fourth amendment. 114 Idaho at 748, 760 P.2d at 1164. We said in *State v. Newman,* 108 Idaho 5, 10 n. 6, 696 P.2d 856, 861 n. 6 (1985), that

> state Courts are at liberty to find within the provisions of their constitutions greater protection than is afforded under the federal constitution as interpreted by the United States Supreme Court. *See Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975). This is true even when the constitutional provisions implicated contain similar phraseology. Long gone are the days when state courts will blindly apply United States Supreme Court interpretation and methodology when in the process of interpreting their own constitutions.

Such independent state analysis does not mean that the Court will reach a result different from the United States Supreme Court, *see e.g., State v. Lang,* 105 Idaho 683, 672 P.2d 561 (1983) (independently adopting *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) under art. 1, § 17); it only means that we are free to do so, if it is determined that a different rule better effectuates our counterpart Idaho constitutional provision.

PART IV. THE MERITS OF THE GOOD FAITH EXCEPTION TO THE EXCLUSIONARY RULE DO NOT JUSTIFY ITS ADOPTION UNDER THE IDAHO CONSTITUTION.

■ We next turn to the question of whether the *Leon* good faith exception to the exclusionary rule merits its adoption under art. 1, § 17. Although we do not doubt and do not challenge the United States Supreme Court's power to define the parameters of fourth amendment protection against unreasonable searches and seizures, it is equally important that the protections accorded under our state constitu-

---

4. The Court of Appeals observed at 109 Idaho at 989, n. 2, 712 P.2d at 690, n. 2, "that, since *Cowen,* our Supreme Court has expressly reserved for another day whether *Leon* is binding in Idaho only as to its interpretation of the federal constitution and would not be similarly applied to the Idaho Constitution."

5. This is not to criticize the Court of Appeals for adopting an interpretation of art. 1, § 17 which was consistent with the fourth amendment. Given the ambiguous language of *Cowen,* the Court of Appeals reasonably concluded that it had no other alternative.

tion not be diminished by a permanently pervading adoption of the federal good-faith exception.

A brief review of the history of both the federal and the Idaho exclusionary rule is helpful in explaining our decision to reject the good-faith exception to the exclusionary rule. The fourth amendment exclusionary rule was first set forth in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Weeks was arrested for illegal gambling. Before trial he moved for the return of incriminating records and letters that had been seized by government officials during a search of his home. The motion was denied and Weeks was convicted. The United States Supreme Court reversed the conviction, holding that the fourth amendment barred the use of the illegally seized evidence:

> If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring the right to be secure against such searches and seizures, is of no value, and so far as those thus placed are concerned, might as well be stricken from the Constitution.

*Weeks*, 232 U.S. at 393, 34 S.Ct. at 344. Accordingly, the Court held that evidence seized in violation of the Fourth Amendment limitation upon governmental power must be excluded. *Weeks*, 232 U.S. at 398, 34 S.Ct. at 346. The Court made it clear that the prosecution's use of illegally seized evidence involved "a denial of the constitutional rights of the accused." *Id.* The *Weeks* Court, however, limited its holding to actions of "the federal government and its agencies." *Id.* Thus, the case did not involve the introduction of illegally seized evidence in a state court prosecution.

Four years thereafter, the three-member Idaho Supreme Court was presented with a case where the factual circumstances were virtually identical to *Weeks*. *State v. Anderson*, 31 Idaho 514, 174 P. 124 (1918). Not surprisingly, Justices Budge and Rice ignored the more enlightened views of Justice Morgan, expressed in *State v. Anderson*, and selected what they viewed as the most appropriate authority upon which to rely, 1 Greenleaf on Evidence, 15th ed. § 254(a), wherein it is said:

> It may be mentioned in this place that though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, there is no valid objection to their admissibility if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question.

> The text quoted above is supported by the cases of *Legatt v. Tollervey*, 14 East, 302, 104 Eng. Reprint, 617; *Jordan v. Lewis*, 14 East, 306, 104 Eng. Reprint, 168; *Commonwealth v. Dana*, 2 Met. (Mass.) 329.)

*State v. Anderson*, 31 Idaho 514, 516–17, 174 P. 124, 125 (1918).

Justices Budge and Rice were still sitting on the Court four years after *State v. Anderson* when the Court revisited the exclusionary rule in *State v. Myers*, 36 Idaho 396, 211 P. 440 (1922). Defendants Myers and Fitzgerald were prosecuted and convicted of the crime of conspiracy to request and accept bribes, allegedly committed in Idaho over a period of time extending from June 1918 to March 1919. A person named White, a member of the state constabulary, delivered to the commissioner of law enforcement "certain papers" taken from the residence of defendant Myers, which at trial were marked and placed in evidence as state's exhibit 4. It was unclear how White obtained exhibit 4 from the Myers residence, but it is certain that he did so. Myers' objection to the trial court's refusal to return exhibit 4 to him, or to bar its admission was fruitless. On the appeal to the Idaho Supreme Court, recognition was accorded to that particular assignment of error, the first of nine assignments raised on the appeal pursued by Myers, *see* discussion at 36 Idaho 401–02, 211 P. 440–41, but Justices Budge and Rice remained steadfastly obdurate. Almost eleven pages were consumed in defending their stand and culminated in their tribute

to California's *People v. Mayen*, 188 Cal. 237, 205 P. 435 (1922), which the two justices perceived to be "the correct rule," supported by the weight of authority:

> The Constitution and the laws of the land are not solicitous to aid persons charged with crime in their efforts to conceal or sequester evidence of their iniquity. From the necessities of the case the law countenances many devious methods of procuring evidence in criminal cases. The whole system of espionage rests largely upon deceiving and trapping the wrongdoer into some involuntary disclosure of this crime. It dissimulates a way into his confidence; it listens at the keyhole and peers through the transom-light. It is not nice, but it is necessary in ferreting out the crimes against society which are always done in darkness and concealment.
>
> Thus it is that almost from time immemorial courts engaged in the trial of a criminal prosecution have accepted competent and relevant evidence without question, and have refused to collaterally investigate the source or manner of its procurement, leaving the parties aggrieved to whatever direct remedies the law provides to punish the trespasser, or recover the possession of goods wrongfully taken.

*State v. Myers*, 36 Idaho at 402, 211 P. at 422 (*quoting People v. Mayen*, 188 Cal. 237, 205 P. 435). Justice Budge, with Justice Rice continuing to concur, after noting the provisions of Sections 13 and 17 of art. 1, Idaho Constitution,[6] wrote as to those protections:

> Similar provisions are contained in the fourth and fifth amendments to the constitution of the United States, but it is well settled that these amendments apply to the federal government and its agencies, rather than to the states. (6 R.C.L., Constitutional Law, sec. 233, p. 247, note 3.)
>
> The question is therefore presented, whether under the constitution and laws of this state, papers or other subjects of evidence, which have been illegally taken from the possession of the party against whom they are offered, are admissible in evidence after timely demand has been made upon, and denied by, the trial court for the return thereof.

*State v. Myers*, 36 Idaho at 402, 211 P. at 411. Justice Budge also cited to and relied upon the majority opinion in *State v. Anderson*, 31 Idaho 514, 174 P. 124, which was attributable only to himself and Justice Rice.[7]

---

6. "(Sec. 13) No person shall be ... compelled in any criminal case to be a witness against himself,...." and "(Sec. 17) [T]he right of the people to be secure in their persons, houses, and effects against unreasonable search and seizure shall not be violated, and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized." *State v. Myers*, 36 Idaho at 402, 211 P. at 441.

7. Justice Morgan, the other member of that three-justice court, opened his dissent in *State v. Anderson*, 31 Idaho at 519, 174 P. at 126, on a lamenting note, "Some time ago I was assigned the task of preparing the opinion of the court in this case ... but my utmost efforts have not convinced the other justices of the soundness of my logic, nor of the wisdom of the decisions of the supreme court of the United States ... in similar cases." He then noted the similarity of *Anderson* to the factual circumstances in *Weeks v. United States*, which was followed by a well-stated plea aimed at persuading the other two justices:

> In order that the total disregard, disclosed by this record, of these constitutional safeguards may be effectual the court must become a party to it by receiving the results as proof. I decline to do so, and hold that evidence procured by an illegal and unreasonable search, the purpose of which was to discover and seize it, is inadmissible if timely and proper objection be made to its introduction, because it was procured by an invasion of the rights guaranteed to all persons within this state by sec. 17, art. 1, of the constitution, and to admit it, against a defendant in a criminal case over such an objection, would be a violation, by the court, of sec. 13 thereof.
>
> These sections are guardians of American liberty and justice which come to us from the same source and with like sacrifice as did those, equally but not more greatly prized, whereby we are guaranteed religious liberty, trial by jury, the right to bear arms, to peaceably assemble, free speech, liberty of the press, and many other constitutional safeguards which, because they have been faithfully upheld by the courts, have accomplished more than has any other agency to make this government one which the peoples of the earth may profitably copy.

Fortunately, the day was not long-coming when the constitutionally tempered views of Justice Morgan set out in *Anderson* would return Idaho to constitutional doctrine. This happened in 1926 after attorney Herman H. Taylor (obviously sharing the same views as Justice Morgan), was elected to the Idaho Supreme Court and took office. In the ensuing year Justice Taylor authored the Court's opinion in *State v. Arregui*, 44 Idaho 43, 254 P. 788 (1927), therein overruling *Anderson* and adopting the *Weeks* exclusionary rule as being the better suited for Idaho. Thus it was that Justice Morgan and Justice Taylor, acting not in concert but in tandem over a span of ten years, blessed the people of Idaho with substantial protections against improper and unconstitutional incursions into their lives.[8] Those protections remain intact insofar as the Idaho Constitution is concerned.

It should be emphasized that the fourth amendment exclusionary rule did not apply to the states when *Arregui* was decided and, thus, the exclusionary rule in Idaho became based wholly upon the state constitution. *See Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (the fourth amendment applies to the states, *but* the fourth amendment *exclusionary rule* does not). Thus, Idaho has had an independent exclusionary rule based upon the state constitution for the past sixty-five years.

The United States Supreme Court did not make the fourth amendment exclusionary rule mandatory upon the states until 1961. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The *Mapp* Court held that "all evidence obtained by searches in violation of the Constitution is, by that same authority, inadmissible in a state court." 367 U.S. at 655, 81 S.Ct. at 1691. The *Mapp* Court partially overruled *Wolf* because "the admission of the new constitutional right by *Wolf* could not consistently tolerate denial of its most important constitutional privilege, namely the exclusion of evidence which an accused had been forced to give by reason of an illegal seizure. To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment." 367 U.S. at 656, 81 S.Ct. at 1692. The *Mapp* Court reiterated that the *Weeks* exclusionary rule was mandated by the constitution in order to provide a remedy to those who have had their fourth amendment rights violated. 367 U.S. at 648, 81 S.Ct. at 1688. Additionally, the Court noted that the exclusionary rule had three other purposes: 1) that the rule would prevent the use of evidence which was "tantamount" to a coerced confession, 367 U.S. at 656, 81 S.Ct. at 1692; 2) the rule would serve as a deterrent to fourth amendment violations, 367 U.S. at 658, 81 S.Ct. at 1693; and 3) the rule would protect judicial integrity. 367 U.S. at 659, 81 S.Ct. at 1693–94.

If the security of the person and the home are not protected by the constitution, the right to the exercise and enjoyment of religious faith and worship may be withdrawn. If unreasonable searches and seizures, without warrant, are to be permitted, trial by jury may be denied. If officers may, upon suspicion, search the persons and homes of the inhabitants of Idaho, the rights of the people to bear arms for their security and defense, to peaceably assemble, to freely speak, write and publish, are in danger. Whenever the courts lend their sanction to the abolition of one of these sacred rights the fundamental principle, which forms the foundations of all of them, is cut away and our boast of free government becomes an idle waste of breath.

While a violation of the law against the transportation of intoxicating liquor into Idaho is by no means to be excused or minimized, and while perpetrators of that crime should be, as they are being, sought out, apprehended, convicted and punished, the means employed in so doing must not be such as are prohibited by the constitution, and the fact must not be lost sight of that the people of a state are in more real danger from a court of last resort which participates in the violation of its fundamental laws, even in order to bring a criminal to justice, than they are from the most persistent efforts of all the bootleggers at large.

*State v. Anderson*, 31 Idaho at 527–28, 174 P. at 129. (Morgan, J., dissenting).

8. *State v. Arregui*, very well might have died aborning had it surfaced with Justice Budge and Justice Rice both still on the bench. Fortunately, only Justice Budge remained, and the composition of the five-member Court, in addition to Justice Taylor, included Justices Wm. E. Lee, (Chief Justice), T. Bailey Lee, and Raymond L. Givens. Justice Budge was a sole dissenter, but wrote not.

In the 1970's, the United States Supreme Court started to rewrite its own exclusionary rule history. In doing so, it began to deny that the *Weeks–Mapp* purposes behind the exclusionary rule had ever existed and instead asserted that the only purpose which ever justified the exclusionary rule was the deterrence rationale. The first case to put forth this revisionist history of the exclusionary rule was *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). There the United States Supreme Court made a clear break with this Court's reasons for adopting the independent state exclusionary rule. The Supreme Court stated that:

> The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim.... Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.... In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal right of the party aggrieved.

*Calandra*, 414 U.S. at 347–48, 94 S.Ct. at 619–20. The *Calandra* court held that the exclusionary rule did not apply to grand jury proceedings, basing its decision on the belief that: "Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best." *Calandra*, 414 U.S. at 351, 94 S.Ct. at 621.

The apex of this post-*Mapp* view of the exclusionary rule was reached in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). There, the Supreme Court relied on the *Calandra* decision in announcing a "good faith" exception to the federal exclusionary rule. The Supreme Court held that evidence obtained by the police in a good-faith reliance on a warrant need not be suppressed, even if the warrant is not supported by probable cause and thus is in violation of the fourth amendment. The Court reasoned that as long as the officer acted in good faith reliance upon a warrant, there was no police misconduct "and thus nothing to de-

ter." 468 U.S. at 921, 104 S.Ct. at 3419. And, as deterrence of police misconduct is the only purpose justifying the exclusionary rule, the rule has no application in such cases. *Id.* The good faith exception has since been extended by the Supreme Court to include situations where the police engage in an illegal search in good faith reliance upon an illegal statute. *Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987).

## PART V. WE REJECT THE *LEON* GOOD FAITH EXCEPTION FOR THE REASONS BELOW.

### A. The Good Faith Exception is Incompatible With The Multiple Purposes Behind our Independent State Exclusionary Rule.

As noted above, the *Leon* holding could not have been reached but for the Supreme Court's narrow justification for the exclusionary rule. However, in Idaho this Court has held that the exclusionary rule does more than merely deter police misconduct. In *Arregui*, we said that the exclusionary rule was a constitutionally mandated remedy for illegal searches and seizures. In *State v. Rauch*, 99 Idaho 586, 593, 586 P.2d 671, 678 (1978), we said that evidence illegally seized must be suppressed because to admit it would constitute an independent constitutional violation by the court in addition to the violation at the time of the illegal search. In *State v. LePage*, 102 Idaho 387, 391–92, 630 P.2d 674, 678–79 (1981), *cert. denied* 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1982), while we recognized that the deterrence of police misconduct was a purpose, we also recognized that judicial integrity mandated the exclusionary rule. *See also State v. Johnson*, 110 Idaho 516, 524–26, 716 P.2d 1288, 1296–98 (1986) (recognizing the different purposes of the state exclusionary rule). In sum the bases for our state exclusionary rule are the same as those set forth in *Mapp* and are inimicable to the view taken by the Supreme Court in *Calandra*.

Additionally, we believe the exclusionary rule is also properly directed toward the

warrant issuing process itself. We agree with those commentators who have noted that "it is somewhat odd to suppose that the exclusionary rule was not designed to deter the issuance of invalid warrants." Wasserstrom and Mertens, *The Exclusionary Rule on the Scaffold: But Was it a Fair Trial?*, 22 Am.Crim.L.Rev. 85, 106 (1984). Without a doubt one of the purposes of art. 1, § 17 is to prohibit the issuance of warrants on less than probable cause. The text of art. 1, § 17 is clear: "no warrant shall issue without probable cause...." The exclusionary rule encourages judges to take seriously their obligation to ensure that the probable cause requirement of art. 1, § 17 is met before a warrant is issued. This is not to say that we fear that judges are intentionally issuing warrants knowing that probable cause does not exist. Rather, we feel certain that search warrants which fail to meet the probable cause standard more often "result from carelessness rather than intentional constitutional violations, and just as surely the exclusionary rule is logically directed to those more common violations." 1 W. LaFave, *Search and Seizure* § 1.3(d), p. 55 (2d ed. 1987). "In other words, the long-standing application of the exclusionary rule in with-warrant cases has served not only to deter the occasional ill-spirited magistrate, but more importantly to influence judicial behavior more generally by ... creating an 'incentive to err on the side of constitutional behavior.'" *Id.*, quoting *United States v. Johnson*, 457 U.S. 537, 561, 102 S.Ct. 2579, 2593, 73 L.Ed.2d 202 (1982). The more important issue, in this regard, "is not the deterrent effect of the exclusionary rule on the conduct of individual magistrates, but the extent to which the rule helps preserve the integrity of the warrant issuing process as a whole." Wasserstrom and Mertens, *supra*, at 109.

 In sum, the United States Supreme Court has abandoned the original purposes of the exclusionary rule as announced in *Weeks* and adopted by this Court in *Arregui*, in that the federal system has clearly repudiated any purpose behind the exclusionary rule other than that of a deterrent to illegal police behavior. Thus, the change in federal law has provided an impetus for a return by this Court to exclusive state analysis. We believe that the exclusionary rule should be applied in order to: 1) provide an effective remedy to persons who have been subjected to an unreasonable government search and/or seizure; 2) deter the police from acting unlawfully in obtaining evidence; 3) encourage thoroughness in the warrant issuing process; 4) avoid having the judiciary commit an additional constitutional violation by considering evidence which has been obtained through illegal means; and 5) preserve judicial integrity. We see no reason to depart from the exclusionary rationale set out in *Weeks* and *Arregui* and their progeny, not withstanding the United States Supreme Court's recent begrudging approach towards fourth amendment protection.

 Additionally, we disagree with the basic premise of the *Leon* decision—that the decision whether to apply the exclusionary rule should be made by determining whether the goal of police deterrence would be furthered in the case at bar—because it totally fails to take into account the other purposes of our independent state exclusionary rule. We believe, regardless of whether the goal of police deterrence would be served, that the other purposes of the state exclusionary rule justify application of the rule in every case where evidence is seized pursuant to a warrant which is not supported by a showing of probable cause. In this regard, we are in agreement with some of the states which have rejected the good faith exception on state constitutional grounds. *See, e.g.*, *People v. Bigelow*, 66 N.Y.2d at 427, 488 N.E.2d at 458, 497 N.Y.S.2d at 427; *State v. Carter*, 322 N.C. at 722, 370 S.E.2d at 561; *State v. Oakes*, 598 A.2d 119, 126 (Vt.1991); *State v. Marsala*, 216 Conn. at 167, 579 A.2d at 66.

### B. The Leon Court's Cost–Benefit Analysis of the Exclusionary Rule is an Inappropriate Method of Determining the Value of the Rule.

We would reject the good faith rule even if the preceding discussion were the only

basis for our doing so. However, our concern goes much further. To begin with, we reject the *Leon* Court's cost-benefit analysis of the exclusionary rule. In this regard, it is important to remember that rules which exclude evidence are not unique in our jurisprudence. This Court requires the exclusion of numerous categories of highly reliable and relevant evidence from both civil and criminal trials. *See e.g.,* I.R.E. 502 (attorney-client privilege); I.R.E. 503 (physician and psychotherapist-patient privilege); I.R.E. 504 (husband-wife privilege); I.R.E. 505 (religious privilege); I.R.E. 506 (political vote privilege); I.R.E. 508 (governmental privilege); I.R.E. 509 (identity of police informant privilege); I.R.E. 514 (parent-child privilege); I.R.E. 515 (accountant-client privilege); I.R.E. 516 (school counselor-student privilege); I.R.E. 517 (licensed counselor-client privilege); I.R.E. 518 (licensed social worker-client privilege); I.R.E. 519 (hospital, in-hospital medical staff committee-medical society privilege); I.R.E. 520 (medical malpractice screening committee panel privilege). Beyond the law of privilege, the rules of evidence also limit or forbid the admission of what some might consider relevant evidence for public policy reasons. *See e.g.,* I.R.E. 404(a) (character evidence); I.R.E. 407 (subsequent remedial measures); I.R.E. 408 (compromise and offers to compromise); I.R.E. 409 (payment of medical and similar expenses); I.R.E. 410 (pleas and plea discussions); I.R.E. 411 (liability insurance); I.R.E. 412 (sex crime victim's past behavior); I.R.E. 413 (proceedings of medical malpractice screening panels).

If we were to adopt the *Leon* cost-benefit rationale to the suppression of evidence, we might eventually have to reconsider all the evidentiary privileges listed above, all of which exclude evidence in an endeavor to protect societal values or foster laudable societal goals. Arguably, one could never prove the cost-effectiveness of any of the above rules. Nevertheless, this Court has adopted all of them in recognition that pure cost-benefit analysis is an inadequate tool to evaluate such rules. All of the rules which limit the admission of relevant evidence, including the exclusionary rule, exist to protect values which are difficult to quantify, yet which are considered important by society.

Turning to the exclusionary rule itself, the Vermont high court has written that the *Leon* cost-benefit analysis is of no value because the costs and benefits involved cannot be accurately gauged:

> The ultimate criticism of the Court's cost-benefit analysis in *Leon* is that it is attempting to do what at this time cannot be done. There simply are insufficient empirical data for the costs and benefits of a good faith exception to be accurately assessed. The benefits of the exclusionary rule are hard to measure because they consist of "non-events." "Police compliance with the exclusionary rule produces a non-event which is not directly observable—it consists of *not* conducting an illegal search." Morris, *The Exclusionary Rule and Posner's Economic Analysis of Law,* 57 Wash.L.Rev. 647, 653 (1982) (emphasis in original).
>
> . . . .
>
> [E]mpirical pronouncements without empirical support are not persuasive. Because of the inability at this time to measure the costs of the exclusionary rule, see [468 U.S.] at 942, 104 S.Ct. at 3436 (Brennan, J., dissenting), we do not find persuasive the Court's conclusion as to a good faith exception to the exclusionary rule.

*State v. Oakes,* 598 A.2d 119, 126 (Vt.1991). We agree with the Vermont court's analysis.

### C. To the Extent the Costs of the Exclusionary Rule Can be Determined, the Leon Majority Overstates Them.

Even if we were to adopt the *Leon* Court's mode of analysis, the majority there failed to show that the costs of the exclusionary rule are unacceptably high. According to the *Leon* majority, the rule needs to be limited because of "[t]he substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights...." 468 U.S. at 907, 104 S.Ct. at 3412. This central assumption

of the *Leon* majority has no empirical basis and is otherwise fallacious.

First, the *Leon* majority attributes the costs of the fourth amendment to the exclusionary rule. They repeatedly refer to the costs of the exclusionary rule as though such costs were something distinct from the costs of the fourth amendment itself. Justice Stewart correctly observes that:

[m]uch of the criticism leveled at the exclusionary rule is misdirected; it is more properly directed at the Fourth Amendment itself.... The exclusionary rule places no limitations on the actions of the police. The fourth amendment does. The inevitable result of the Constitution's prohibition against unreasonable searches and seizures and its requirement that no warrants shall issue but upon probable cause is that police officers who obey its strictures will catch fewer criminals.... [T]hat is the price the framers anticipated and were willing to pay to ensure the sanctity of the person, home, and property against unrestrained governmental power.

Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search and Seizure Cases,* 83 Colum.L.Rev. 1365, 1392–93 (1983). Or as Justice Brennan puts it:

[S]ome criminals will go free *not,* in Justice (then Judge) Cardozo's misleading epigram, 'because the constable has blundered,' *People v. Defore,* 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926), but rather because ... compliance with Fourth Amendment requirements [by law enforcement authorities] make it more difficult to catch criminals ... therefore, it is not the exclusionary rule, but the Amendment itself that has imposed the cost.

*Leon,* 468 U.S. at 941, 104 S.Ct. at 3436 (Brennan, J., dissenting). The same analysis holds true for the relationship between art. 1, § 17 and our state exclusionary rule.

Moreover, all that the fourth amendment does is "maintain the status quo that would have prevailed if the constitutional requirement had been obeyed." Dellinger, *Of Rights and Remedies, The Constitution as a Sword,* 84 Harv.L.Rev. 1532, 1563 (1972). The state does not pay a "cost" by being put in a worse position than before the constitutional violation; it is only forbidden to benefit from its error. As the state is only deprived of what it was not entitled to possess in the first place, to say the fourth amendment exacts a cost to the state is like saying that a thief pays for committing a theft when he is required to return what he stole.

Second, the *Leon* majority overstates the "costs" of excluding evidence. Research shows that very little evidence is actually suppressed. As Professor LaFave noted, "[t]o date, the most careful and balanced assessment of all available empirical data shows 'that the general level of the rule's effects on criminal prosecutions is marginal at most.'" 1 W. LaFave, *Search and Seizure* § 1.3(c) p. 52, quoting, T. Davis, *A Hard Look at What We Know (and Still Need to Learn) About the 'Costs' of the Exclusionary Rule: The NIJ Study and Other Studies of 'Lost' Arrests,* 1983 Am.B.Found.Research J. 611, 622. According to the *Leon* Court, the study by Davis concludes that the exclusion of evidence results in nonprosecution or nonconviction of between 0.6% and 2.35% of individuals arrested for felonies. That same study further

suggests that [in California] screening by police and prosecutors results in the release because of illegal searches or seizures of as many as 1.4% of all felony arrestees ... that 0.9% of felony arrestees are released, because of illegal searches or seizures, at the preliminary hearing or after trial ... and that roughly 0.05 of all felony arrestees benefit from reversals on appeal because of illegal searches.

468 U.S. at 907 n. 6, 104 S.Ct. at 3412 n. 6. According to another researcher, the exclusion of evidence has a "truly marginal" effect on the criminal court system. P. Nardulli, *The Societal Costs of the Exclusionary Rule: An Empirical Assessment,*

1983 Am.B.Found.Research J. 585, 606–607. In this study of nine counties in Illinois, Michigan and Pennsylvania, the author found that motions to suppress physical evidence were filed in fewer than five percent of the 7,500 case studies and such motions were successful in only 0.7% of all cases. *Id.* at 596; *see also* P. Nardulli, *The Societal Costs of the Exclusionary Rule Revisited*, 1987 U.Ill.L.Rev. 223, 238–39 (confirming earlier study).

As Justice Brennan noted:

[I]ndeed, as the Court acknowledges, recent studies have demonstrated that the "costs" of the exclusionary rule—calculated in terms of dropped prosecutions and lost convictions—are quite low. Contrary to the claims of the rule's critics that exclusion leads to "the release of countless guilty criminals," ... these studies have demonstrated that federal and state prosecutors very rarely drop cases because of potential search and seizure problems. For example, a 1979 study prepared at the request of Congress by the General Accounting Office reported that only 0.4% of all cases actually declined for prosecution by federal prosecutors were declined primarily because of illegal search problems.... If the GAO data are restated as a percentage of *all* arrests, the study shows that only 0.2% of all felony arrests are declined for prosecution because of potential exclusionary rule problems.... Of course, these data describe only the costs attributable to the exclusion of evidence in all cases; the costs due to the exclusion of evidence in the narrower category of cases where police have made objectively reasonable mistakes must necessarily be even smaller.

*Leon,* 468 U.S. at 950–51, 104 S.Ct. at 3441–42 (Brennan, J., dissenting), (citations omitted). "This is not an insignificant error, for had the Court's 'cost' inquiry been properly focused it would have been apparent that the relevant costs are insubstantial." 1 W. LaFave, *supra,* § 1.3(c), p. 52.

Third, whatever cost there is in excluding evidence, it has already been greatly minimized in Idaho because of our adoption of the "totality of the circumstances" test regarding the amount and type of evidence necessary to establish probable cause. As noted above, this Court adopted the rule of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), in *State v. Lang,* 105 Idaho 683, 672 P.2d 561 (1983). *Gates*'s fluid concept of probable cause eliminates much of the *Leon* Court's justification for the good faith exception. As our Court of Appeals, per Judge Donald Burnett, explained:

*Leon* provides ... an exception when the affidavit or sworn testimony is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." We confess that we are unsure how this quantum of evidence compares to the level needed to support a probable cause determination under *Gates.* It splits a fine hair indeed to say that the evidence is so deficient there is no "substantial basis" to find probable cause under a "totality of circumstances," but that the evidence still is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." For the vast majority of cases, it would appear that the Supreme Court in *Gates* and *Leon* has killed one bird with two stones. Only in an exceptionally narrow band of cases would the evidence fall short of the *Gates* standard yet be sufficient to permit a reasonable official belief in probable cause as denoted in *Leon.*

*State v. Schaffer,* 107 Idaho 812, 822, 693 P.2d 458, 468 (Ct.App.1984).

Finally, the majority overstates the benefits of the good faith rule. By aggregating the costs of excluding evidence in all cases, irrespective of the circumstances which led to the exclusion, the *Leon* majority also overstates the potential benefit of the good faith exception. We have no way of knowing how many instances of evidence exclusion have occurred simply because the police reasonably, but mistakenly, relied upon an insufficient warrant issued by a magistrate. Thus, we have no idea of how much "benefit" in the form of increased convictions will result from the good faith rule.

### D. The Leon Majority Underestimates the Benefits of the Exclusionary Rule.

We cannot help but observe that just as it is difficult to quantify the "costs" and "benefits" of the exclusionary rule, it is also difficult to quantify the "costs" and "benefits" of the good faith exception thereto. For that reason we are not prepared to adopt the *Leon* cost-benefit approach. We have noted that a study conducted after the *Leon* decision tentatively concluded that the short term effect of the decision was minimal, but went on to state that "[b]ecause of the constraints of the short span of time since the *Leon* decision and the non-experimental design of the study, no determination could be made of the lasting effects of the ruling." The authors go on to state that "as states resolve the questions surrounding the decision, a more substantial impact may be observed in the future." Uchida, Bynum, Rogan, Murasky, *Acting in Good Faith: The Effects of United States v. Leon on the Police and the Courts*, 30 Ariz.L.Rev. 467, 494 (1988). Recognizing that such is not a matter appropriately analyzed by a pure cost benefit analysis, we nevertheless believe that the good faith exception comes with potential costs. These potential costs have the force of logic behind them and are just as likely to occur as any potential decrease in the costs of the fourth amendment claimed by those who favor a good faith exception.

A crucial premise in the *Leon* majority's argument in favor of the good faith exception is that the police deterrence function of the exclusionary rule is not served when a warrant turns out to be constitutionally defective. According to the majority, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." 468 U.S. at 921, 104 S.Ct. at 3419. However, as Justice Brennan's dissent points out, this argument "captures only one comparatively minor element of the generally acknowledged purposes of the exclusionary rule.... [T]he chief deterrent function of the rule is its tendency to promote institutional compliance with Fourth Amendment requirements on the part of law enforcement agencies generally." *Id.* Otherwise stated, the exclusionary rule encourages police departments to devote greater care and attention to providing the magistrate with sufficient evidence to establish probable cause. The good faith exception, on the other hand, places a premium on police ignorance of the law.

Because the good faith exception raises the value of having a warrant (as opposed to having a valid warrant), the benefits to be gained from "magistrate shopping" are heightened. As the Connecticut court noted, "the good faith exception would encourage some police officers to extend less effort in establishing the necessary probable cause to search and more effort in locating a judge who might be less exacting than some others." *State v. Marsala*, 216 Conn. at 169, 579 A.2d at 67. An empirical study has shown that there are substantial disparities between magistrates as to how much evidence is required to obtain a search warrant. *See* Davis, *supra*, n. 17, at 666. There can be no doubt the police on the street know this from experience and will use it to their advantage, absent a reason not to do so.

Not only does the good faith exception provide an incentive for the police to spend less time garnering evidence to establish probable cause, it also creates a disincentive for magistrates to be vigilant in their role as neutral guardians of the constitution. The good faith exception implicitly tells magistrates that they need not take much care in reviewing warrant applications, since their mistakes will be of virtually no consequence. If the magistrate was incorrect as to the existence of probable cause, but the police relied in good faith upon it, the evidence is nonetheless admitted; thus, there is no institutional incentive to do it right. "Inevitably, the care and attention devoted to such an inconsequential chore will dwindle." *Leon*, 468 U.S. at 956, 104 S.Ct. at 3443 (Brennan, J. dissenting).

Another consequence of effectively discontinuing review of the issuing judicial

officer's probable cause determination is that there will be less guidance for these judicial officers as to what constitutes probable cause.

> [I]t is in close fourth amendment cases that new law is made and guidance to magistrates and the police is most needed. Close cases are both the hardest to decide and the easiest to dispose of under the good faith exception; in such cases the officer's objective good faith is clearest. Thus, these are the cases that defendants are least likely to litigate and the courts most likely to dispose of without reaching the merits of the fourth amendment claim.

Wasserstrom and Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am.Crim.L.Rev. 85, 112 (1984). Absent such guidance, some courts believe that the number of mistakes made by judicial officers will increase. *See State v. Oakes*, 598 A.2d at 126; *State v. Marsala*, 216 Conn. at 126–27, 579 A.2d at 67.

The New Jersey Supreme Court reached a related conclusion:

> Whatever else may be said for or against the *Leon* rule, the good-faith exception will inevitably and inexorably diminish the quality of evidence presented in search-warrant applications. By eliminating any cost for noncompliance with the constitutional requirement of probable cause, the good-faith exception assures us that the constitutional standard will be diluted.

*State v. Novembrino*, 105 N.J. at 129, 519 A.2d at 854.

The exclusionary rule unencumbered by the good faith exception provides incentives for the police department and the judiciary to take care that each warrant applied for and issued is in fact supported by probable cause. In addition to encouraging compliance with the constitutional requirement that no warrant shall issue but upon probable cause, it also lessens the chances that innocent citizens will have their homes broken into and ransacked by the police because of warrants issued upon incomplete or inaccurate information. We believe these are laudable effects of the exclusion-

ary rule which appear to have gone unrecognized by the *Leon* majority.

## PART VI. CONCLUSION

In sum, we finally and unequivocally no longer adhere to a policy of sheepishly following in the footsteps of the U.S. Supreme Court in the area of state constitutional analysis. Based on our independent analysis of the merits of the good faith exception, as viewed in light of long-standing provisions of our Idaho Constitution, we are convinced that it is ill-conceived and cannot be reconciled with art. 1, § 17 of our state constitution. Accordingly, we conclude that the citizenry of Idaho will be better served if it no longer controls. We so hold.

For the reasons stated in this opinion, the *Hays* "review denied" rule is now expressly disavowed; the *Prestwich* adoption of the *Leon* "good faith" exception to the exclusionary rule is abandoned; the decision of the district court on the motion to suppress is reversed, and the cause is remanded for further proceedings. Because of our resolution of the good-faith exception issue, we need not address the propriety of the district court's ruling which denied Guzman's motion to compel the State to reveal the identity of the confidential informant.

JOHNSON, J. concurs in I, III, IV, and V(A); and concurs in the result in VI.

McDEVITT, J. concurs in I, II, and III; and concurs in the result in IV, V, and VI.

BOYLE, J. sat, but did not participate in this opinion due to his resignation on March 31, 1992.

BAKES, Chief Justice, dissenting.

The opinion in this case reverses *Nash v. Overholser* and *State v. Hays* and the "review denied" rule, and then, based on that, overturns the *Leon* "good faith" exception to the exclusionary rule. While I agree with the Court's decision to overturn the "review denied" rule, *see State v. Hays*, 115 Idaho 315, 766 P.2d 785 (Bakes, J., dissenting), I dissent from the Court's deci-

sion to reverse direction on the *Leon* "good faith" rule.

The *Leon* "good faith" rule has been followed by the courts of this state since the Court of Appeals decision in the case of *State v. Rice,* 109 Idaho 985, 712 P.2d 686 (Ct.App.1985). This Court twice affirmed the application of the *Leon* "good faith" exception to the exclusionary rule, first in *State v. Prestwich,* 116 Idaho 959, 783 P.2d 298 (1989), and then again in our first opinion in this case issued on November 19, 1990, where we held that, *"Leon* is the law in Idaho not because of what the Court of Appeals did in *State v. Rice,* but because of the merits of *Leon* itself." Nothing has occurred since 1990 which should change that holding. Even though a majority is now overturning the review denied rule of *Hays* and *Nash,* there is no reason to retroactively apply the overturning of the review denied rule so as to affect this Court's adoption of the good faith rule in *State v. Prestwich,* an opinion joined in by three justices, who said that, *"Leon* is the law in Idaho not because of [the review denied rule], but because of the merits of *Leon* itself." The merits of the *Leon* "good faith" rule haven't changed since this Court approved it in 1990.

Nevertheless, the Court's opinion today rejects the good faith exception to the exclusionary rule, based upon Article 1, § 17, of the Idaho Constitution. However, the reasons which this Court has given in justifying the application of the exclusionary rule under Article 1, § 17, of the Idaho Constitution are not applicable to this case. In *State v. Johnson,* 110 Idaho 516, 716 P.2d 1288 (1986), we explained the policy behind the application of an exclusionary rule based on Article 1, § 17, of the Idaho Constitution. The *Johnson* opinion states:

> The primary reason for the good-faith exception, as the *Leon* Court stated it, is that application of the exclusionary rule would have no deterrent effect where it was the *judge* who committed the error that invalidated the warrant and not the police officer. *Leon, supra* [468 U.S. at 918], 104 S.Ct. at 3418. Here, however, the error was *not* committed by the judge. Rather, the error was committed by law enforcement personnel—the pre-

cise group of government officials to whom the exclusionary rule has been directed. Accordingly, *Leon's* good-faith exception is inapplicable.

110 Idaho at 529, 716 P.2d at 1301 (emphasis in original).

In the present case the law enforcement officer presented his facts to a judge, who issued the search warrant, directing the officer to search for and seize the property. The officer executed the search warrant precisely as the law requires. As was later determined, it was the judge, not the officer, who made an erroneous determination that adequate probable cause had been shown. Excluding the evidence in this case will not serve any deterrent effect to law enforcement officers, the group which our *Johnson* case said was the focus of the exclusionary rule. Nor will it deter lawbreakers, who will be encouraged—not deterred—from engaging in crime, by application of the exclusionary rule in this case.

As expressed in *State v. Johnson,* there is a public concern regarding the stability and proper functioning of the judiciary, expressed in that opinion as "we are cognizant of the need to ensure that the judiciary does function," and that there is an "imperative of judicial integrity." A continued application of the good faith exception will enhance the public's confidence in the stability of our judicial institutions. Changing directions after seven years and two prior opinions approving the good faith exception will not enhance the public's confidence in the stability and integrity of the judiciary. While the public can understand and accept the application of the exclusionary rule when a law enforcement officer violates the law, the public has difficulty understanding the suppression of evidence of a crime merely because it is later determined that a judge made an error in evaluating the evidence in support of a search warrant.

Accordingly, I would vote to affirm the decision of the trial court.

JOHNSON, Justice, dissenting, concurring, and concurring in the result.

I respectfully dissent from part II of the opinion of the Court that overrules the

"review denied rule" and the portion of *State v. Prestwich*, 116 Idaho 959, 783 P.2d 298 (1989), that approved the applicability of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) under article 1, § 17 of our state constitution.

Being liberated, however, by part II from the review denied rule and from *Prestwich*, I concur in parts I, III, IV, and V(A) of the Court's opinion, and concur in the result of part VI. In my view, parts V(B)–(D) are dicta.

## THE REVIEW DENIED RULE: A SHORT–LIVED PRECEDENT

The review denied rule has been part of the jurisprudence of this state since at least December 21, 1988, the day our opinion in *Hays v. State*, 115 Idaho 315, 766 P.2d 785 (1988), was issued. *See also Nash v. Overholser*, 114 Idaho 461, 463–65, 757 P.2d 1180, 1182–84 (1988) (Johnson, J., specially concurring, with Bistline and Huntley, JJ., concurring).

In *Hays*, we said that when this Court denies review of a decision of our Court of Appeals, the decision of the Court of Appeals becomes "controlling precedent in this state with regard to any new principles of law announced there." *Hays*, 115 Idaho at 316, 766 P.2d at 786. Our decision in *Hays* was premised on the rule established by our Court of Appeals in *Brooks v. State*, 108 Idaho 855, 702 P.2d 893 (Ct.App.1985) (review denied). By our decision in *Hays*, the review denied rule became part of the law of this state. By the opinion of the Court today, this precedent expires before reaching the tender age of four years.

The demise of the review denied rule causes me to ponder whether there remains any vitality in the rule of stare decisis. As articulated by this Court, the rule of stare decisis means " 'that a question once deliberately examined and decided should be considered as settled ... unless it is demonstrably made to appear that the construction manifestly is wrong.' " *Scott v. Gossett*, 66 Idaho 329, 335, 158 P.2d 804, 807 (1945) (Ailshie, C.J., quoting *State ex rel. Kain v. Fischl*, 94 Mont. 92, 20 P.2d 1057, 1059 (1933)). While the rule of stare

decisis was discussed by Chief Justice Ailshie in *Scott* in terms of its application to decisions of the highest court of a state construing constitutional provisions, the rule has been applied in this state in many cases not involving constitutional construction. *E.g., Salinas v. Vierstra*, 107 Idaho 984, 990–91, 695 P.2d 369, 375–76 (1985); *Smith v. State*, 93 Idaho 795, 801, 473 P.2d 937, 943 (1970); *Bethke v. Idaho Sav. & Loan Ass'n*, 93 Idaho 410, 412–13, 462 P.2d 503, 505–06 (1969).

The stability that the rule of stare decisis provides in our legal system is a significant part of what I believe the "rule of law" is all about. If we are free to abandon precedent merely because we are convinced that the rule laid down in a prior case is incorrect or not to our liking, then each appeal has the potentiality to change basic rules upon which this Court, our Court of Appeals and our trial courts have relied in deciding cases. In *Bethke*, Justice McQuade, writing for the Court, pointed out that adherence to prior rulings is supported by these considerations:

"1. *In furtherance of private ordering—*

"(a) The desirability of enabling people to plan their affairs at the stage of primary private activity with the maximum attainable confidence that if they comply with the law as it has theretofore been announced, or can fairly be expected to be announced thereafter, they will not become entangled in litigation.

"(b) The desirability of providing private counsel so far as possible with stable bases of reasoning....

"(c) The desirability of encouraging the remedial processes of private settlement by minimizing the incentives of the parties to try to secure from a different judge a different decision than has been given by the same or other judges in the past.

"2. *In furtherance of fair and efficient adjudication—*

"(a) The desirability, from the point of view of the litigants, of expediting litigation and minimizing its costs by sparing

them the necessity of relitigating every relevant proposition in every case.

"(b) The need, from the point of view of the judicial system, of facilitating the dispatch of business—indeed, the sheer impossibility of reexamining *de novo* every relevant proposition in every case.

"(c) The need of discouraging a rush of litigation whenever there is a change of personnel on the bench.

"(d) The desirability, from the point of view of fairness to the litigants, of securing a reasonable uniformity of decision throughout the judicial system, both at any given time and from one time to another.

"(e) The desirability of promoting genuine impersonality of decision by minimizing the elements of personal discretion, and of facilitating the operation of the check of professional criticism.

"(f) The propriety of according respect to the conclusions of predecessor judges.

"(g) The injustice of disappointing expectations fairly generated at the stage of primary private activity.

"3. *In furtherance of public confidence in the judiciary—*

"(a) The desirability of maximizing the acceptability of decisions, and the importance to this end of popular and professional confidence in (1) the impersonality of decisions and (2) their reasoned foundation, as manifested both by the respect accorded to them by successor judges and by their staying power.

"(b) The necessity, considering the amorphous nature of the limits upon judicial power and the usual absence of an effective political check at the ballot box, that judges be subject to the discipline and the restraint of an obligation to build upon the prior law in a fashion which can withstand the test of professional criticism."

93 Idaho at 412–413, 462 P.2d at 505–506 (quoting from H.M. Hart, Jr. and A.M. Sacks, The Legal Process: Basic Problems in the Making and Application of Law, 587–588 (Cambridge, Mass., tentative ed. 1958)).

Justice McQuade went on to point out in *Bethke:*

[The rule of stare decisis] is not a rule of unreasoning acquiescence. We will not follow incorrect decisions merely because they are there, "the rule, *to stand by decided cases,* and *to maintain former adjudications,* contemplates more than blindly following some former adjudication, manifestly wrong."

93 Idaho at 413, 462 P.2d at 506 (emphasis in original).

In *Smith,* 93 Idaho at 801, 473 P.2d at 943, Justice Donaldson, writing for the Court, said:

This Court in the proper performance of its judicial function is required to examine its prior precedents. When precedent is examined in the light of modern reality and it is evident that the reason for the precedent no longer exists, the abandonment of the precedent is not a destruction of stare decisis but rather a fulfillment of its proper function.

Stare decisis is not a confining phenomenon but rather a principle of law. And when the application of this principle will not result in justice, it is evident that the doctrine is not properly applicable.

In *Salinas,* 107 Idaho at 984, 990, 695 P.2d at 375 (1985), Justice Bistline, writing for the Court, noted:

While we are cognizant of the importance *stare decisis* plays in the judicial process, we are not hesitant to reverse ourselves when a doctrine, a defense, or a holding in a case, has proven over time to be unjust or unwise.

*See also Harrison v. Taylor,* 115 Idaho 588, 595–96, 768 P.2d 1321, 1328–29 (1989).

From these "precedents" we can glean that prior decisions of this Court should govern unless they are manifestly wrong or have proven over time to be unjust or unwise. While I am prepared to accept these limitations on the rule of stare decisis, I am not prepared to allow these limitations to convert the precedents of this Court into ephemeral edicts that are here today and gone tomorrow, the duration of their life-span depending on the composition and disposition of the Court. This is

not to say that I am unwilling to overrule precedent that is manifestly wrong. *E.g., Houghland Farms, Inc. v. Johnson,* 119 Idaho 72, 803 P.2d 978 (1990); *State v. Elisondo,* 114 Idaho 412, 757 P.2d 675 (1988).

With this framework for analysis, I examine this decision in which this Court overrules the review denied rule, which was established less than four years ago. The questions we must ask about the rule are whether it has been proven to be manifestly wrong or has proven over time to be unjust or unwise. Keeping in mind the structure of the system of appellate courts in Idaho, I conclude that the review denied rule is neither manifestly wrong nor has it proven over time to be unjust or unwise.

All appeals from the district court in this state are to this Court. No cases may be appealed to the Court of Appeals. I.A.R. 11. The only means by which the Court of Appeals receives cases to decide is by assignment by this Court. I.C. § 1–2406; I.A.R. 108. This distinguishes the relationship of this Court to our Court of Appeals from that of the United States Supreme Court to the circuit courts of the United States. In the federal system, cases are appealed to the circuit courts from the district courts. The circuit courts have their own appellate jurisdiction and are autonomous within that jurisdiction, subject only to being overruled by the United States Supreme Court. The decision of a circuit court is final within the circuit, unless the United States Supreme Court grants certiorari and overrules the circuit. In the federal appellate system, the denial of certiorari does not affect the precedential value of the circuit court's decision within that circuit.

We have recently clarified the role of this Court in reviewing a decision of the Court of Appeals:

> I.A.R. 108 provides that the Court of Appeals shall hear and decide all cases assigned to it by this Court. I.A.R. 118 allows any party to a proceeding aggrieved by an opinion or order of the Court of Appeals to petition this Court to review the opinion or order. Review is granted, if a majority of this Court votes to grant the petition. We may also grant review of an opinion or order of the Court of Appeals on our own motion pursuant to I.A.R. 120.
>
> If we decide to review a decision of the Court of Appeals, we ordinarily consider all the issues presented to the Court of Appeals. Occasionally, we may decide to address less than all of the issues presented to the Court of Appeals. In that case we advise the parties of the issues we will address. As to the issues we decide to address, we consider that we are hearing the matter in the first instance, not merely considering the correctness of the decision of the Court of Appeals.

*Sato v. Schossberger,* 117 Idaho 771, 774–75, 792 P.2d 336, 339–40 (1990).

This process of review is dramatically different from the review by the United States Supreme Court of decisions of the circuit courts. If the Supreme Court grants certiorari, the Court considers the decision of the circuit court, not that of the trial court, as we do when we grant review of a decision of our Court of Appeals. This is further evidence of the significant structural difference in the relationship of this Court to our Court of Appeals and that of the United States Supreme Court to the federal circuit courts.

In Idaho, the Court of Appeals has no appellate jurisdiction of its own. When this Court receives an appeal, a decision must be made whether the case will be heard by this Court or by the Court of Appeals. If the case is assigned to the Court of Appeals, this Court has, in effect, said to the Court of Appeals, "You decide this case, according to the precedents established by this Court." As I see it, when the Court of Appeals has decided the case, the decision becomes the law of the case, unless review is granted by this Court and a new decision announced. By its opinion in this case the majority gives all decisions of the Court of Appeals stating new law the status of controlling precedent in the district courts of this state, even if this Court has not denied review.

This view of the effect of decisions of the Court of Appeals will inevitably leave us with the uncertainty of two tiers of jurisprudence in this state. One tier will be composed of the decisions of the Court of Appeals that are controlling on the district courts. The second tier will be composed of the decisions of this Court. This view of the role of the Court of Appeals as a precedent setting court seems to be negated by both the legislation that created it and by the rules of this Court concerning the assignment of cases to it.

I.C. § 1–2406(2) states:

In assigning cases to the Idaho court of appeals, the Idaho supreme court shall give due regard to the workload of each court, to *the error review and correction functions of the court of appeals,* and to *the desirability of retaining for decision by the supreme court those cases* in which there is substantial public interest or *in which there are significant issues involving clarification or development of the law.*

(Emphasis added.)

I.A.R. 108(b) provides:

Assignment of Cases to Court of Appeals. Generally, cases which involve consideration of existing legal principles will be assigned to the Court of Appeals. In assigning cases to the Court of Appeals, due regard will be given to the workload of each court, and to the error review and correction functions of the Court of Appeals. *Ordinarily, the Supreme Court will retain the following classes of cases:*

(1) Cases in which there is substantial public interest;

(2) *Cases in which there are significant issues involving clarification or development of the law, or which present a question of first impression;*

(3) Cases which involve a question of substantial state or federal constitutional interpretation;

(4) Cases raising a substantial question of law regarding the validity of a state statute, or of a county, city, or other local ordinance;

(5) Cases involving issues upon which there is an inconsistency in the decisions of the Court of Appeals or of the Supreme Court.

(Emphasis added.)

Obviously, there would not be a dispute about the effect of the denial by this Court of a petition to review a decision of the Court of Appeals, if the Court of Appeals were not sometimes stating new law. Whether this Court has intentionally delegated issues to the Court of Appeals that have led to the announcement of new law, or whether these issues lay hidden in the cases when they were assigned, the result has been the same—the Court of Appeals has announced new law in this state. This was the case in *State v. Rice,* 109 Idaho 985, 989, 712 P.2d 686, 690 (Ct.App.1985) (review denied). In *Rice,* the Court of Appeals held that the good faith exception to the exclusionary rule established in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), was applicable under the unreasonable search and seizure provision of our constitution (article 1, § 17). In *State v. Prestwich,* 116 Idaho 959, 960, 783 P.2d 298, 299 (1989), I accepted this decision of the Court of Appeals, because when this Court was presented with the opportunity to review *Rice,* we denied review. Otherwise, I would not have accepted the application of *Leon* to the exclusion of evidence under article 1, § 17 of our state constitution.

According to the opinion of the Court in this case, if the Court of Appeals makes a decision that states new law, the decision is controlling on the district courts of this state, even though this Court has had no opportunity to consider the correctness of the opinion of the Court of Appeals. This, I think, turns our appellate jurisprudence on its head by delegating the making of new law to the Court of Appeals. In my view, decisions of the Court of Appeals stating new law are controlling only when this Court has been presented with a petition for review and denied review. In that case, it seems to me that the decision should be controlling not only on the district courts, but also on the Court of Appeals and on this Court. When we have

denied review, we have had the opportunity to consider the opinion of the Court of Appeals as well as the brief in support of the petition for review. If there is any question as to the correctness of a new statement of law, we should grant review. Our denial of review should be construed as acceptance of the new law.

In my view, the demise of the review denied rule will create less, rather than more, certainty in the law in Idaho. The Court's decision to overrule the review denied rule dictates that I will vote to review any decision of the Court of Appeals that states new law, even new law with which I agree. Otherwise, the trial bench and the bar will be in doubt, perhaps for years, whether this Court will accept or reject the view of the Court of Appeals on the issue involved.