Dissent to Part III: Regarding the Search Warrant, by
ACOBA, J.,
with whom McKENNA, J., joins.
Ours is a long legal history and tradition of protecting the privacy rights of all persons within the State’s territorial boundaries. This fundamental pillar of our State bill of rights can only endure if the judiciary remains faithful to holding inviolate individual protections under the Hawai'i Constitution. Although not labeled as such, the decisions by the majority on the warrant issue herein (Opinion of the Court with respect to Part III, by Recktenwald, C.J.) (hereinafter “majority opinion”) and the Intermediate Court of Appeals (ICA) are an embracement of the so-called “good faith” rule, applicable in federal courts, see discussion infra. That rule is inimical to the privacy protections under the Hawai'i Constitution, and up to this point has been rejected by this court. Respectfully, the majority’s and the ICA’s decisions will, as in the federal courts, render the right of privacy inhering in the right against unreasonable searches and seizures and as an independent right, an empty guarantee.
The underlying premise of the majority’s opinion and its abrogation of State v. Endo, 83 Hawai'i 87, 924 P.2d 581 (App.1996), and the ICA decision reflect an adoption of contrary federal precedent under the federal constitution. Hence, the majority’s opinion and the ICA opinion conflict with the Hawai'i Constitution and Hawai'i case law that was most recently reaffirmed in State v. Torres, 125 Hawai'i 382, 396, 262 P.3d 1006, 1020 (2011).[1]
I.
In its early decisions, the United States Supreme Court held that the Fourth Amendment “forever seeure[d] the people, their persons, houses, papers and effects, against all unreasonable searches and seizures under the guise of law.”[2] Mapp v. Ohio, 367 U.S. 643, 647, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (citing Weeks v. United States, 232 U.S. 383, 391-92, 34 S.Ct. 341, 58 L.Ed. 652 (1914)).[3] *404 The Court declared that the use of improperly seized evidence involved a “denial of the constitutional rights of the accused[,]” id. (citing Weeks, 232 U.S. at 398, 34 S.Ct. 341), and thus “[c]onvietion by means of unlawful seizures ... should find no sanction in the judgments of courts.” Id. at 648, 81 S.Ct. 1684. Evidence acquired by means of unlawful searches and seizures could “not be used at all.” Id. (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920)).
The exclusionary rule stands for the proposition that in a “prosecution, the Fourth Amendment bars the use of evidence secured through an illegal search and seizure.” Mapp, 367 U.S. at 647, 81 S.Ct. 1684 (citing Wolf v. Colorado, 338 U.S. 25, 28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)). In Mapp, the Court applied the exclusionary rale to the states. Id. at 660, 81 S.Ct. 1684. The Court acknowledged that in some cases “under the exclusionary doctrine ‘the criminal is to go free because the constable has blundered.’ ” Id. at 649, 81 S.Ct. 1684 (internal citations omitted) (quoting People v. Defore, 242 N.Y. 13, 150 N.E. 585, 587 (1926)). However, the “imperative of judicial integrity” was more important—the “criminal [may go] free if he must, but it is the law that sets him free.” Mapp, 367 U.S. at 659, 81 S.Ct. 1684 (citing Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). For nothing is apt to “destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.” Id. Mapp identified three purposes served by the exclusionary rale: protection of individual privacy rights guaranteed under the Fourth Amendment, the preservation of judicial integrity and deterrence of police misconduct. Id. at 659-60, 81 S.Ct. 1684.
Two decades later, in a substantial shift from Mapp, the Court in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), abandoned two of the three purposes of the exclusionary rule and decided that the sole purpose of the exclusionary rale was to deter unlawful police conduct.[4] In Leon, police officers executed a facially valid warrant issued by a state superior court judge. 468 U.S. at 902, 104 S.Ct. 3430. A federal district court concluded, however, that the warrant was not supported by probable cause and thus that the judge had erred in issuing it. Id. at 904, 104 S.Ct. 3430. The Ninth Circuit Court of Appeals affirmed. Id.
On review, the Court assumed that the warrant was unsupported by probable cause, but instead of concluding that suppression was the proper remedy under existing precedent, the Court held that the police execution of a warrant was objectively reasonable. Id. at 926, 104 S.Ct. 3430. Thus, according to the Court the exclusionary rule did not bar the use of evidence obtained by the police officers acting in good-faith reliance upon a search warrant even if “ultimately [] found to be defective.” Id. at 907, 104 S.Ct. 3430 (emphasis added). In a reversal of its position in Mapp, the Court indicated that the exclusionary rale did not apply because (1) it was designed to deter police misconduct rather than to punish the errors of judges and magistrates; (2) judges and magistrates were not inclined to ignore the Fourth Amendment; and (3) there was no reason to believe that excluding evidence seized pursuant to a warrant would have a significant deterrent effect on the issuing judge or magistrate. Id. at 906-14, 104 S.Ct. 3430. Leon thus created a so called “good-faith” exception to the enforcement against unreasonable *405 searches and seizures afforded by the exclusionary rule. Id. at 921-22, 104 S.Ct. 3405.
Justice Brennan, joined by Justice Marshall, wrote in dissent that “[t]he judiciary is responsible, no less than the executive, for ensuring that constitutional rights are respected.” Id. at 932, 104 S.Ct. 3405 (Brennan, J. dissenting, joined by Marshall, J.). By admitting unlawfully seized evidence at trial, the judiciary becomes part of a single governmental action prohibited by the Fourth Amendment. Id. at 933, 104 S.Ct. 3405. As Justice Brennan argued, it would be difficult to give any meaning to the limitations imposed by the Amendment if they are read to proscribe only certain conduct by the police “but to allow other agents of the same government to take advantage of evidence secured by the police in violation of its requirements.” Id. at 934, 104 S.Ct. 3405. According to the dissent, “‘[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures’ comprises a personal right to exclude all evidence secured by means of unreasonable searches and seizures.” Id. at 935, 104 S.Ct. 3405 (emphasis added). Concluding, the dissent stated that
the relaxation of Fourth Amendment standards seems a tempting, costless means of meeting the public’s demand for better law enforcement. In the long run, however, we as a society pay a heavy price for such expediency, because as Justice Jackson observed, the rights guaranteed in the Fourth Amendment “are not mere second-class rights but belong in the catalog of indispensable freedoms.” Brinegar v. United States, 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (dissenting opinion). Once lost, such rights are difficult to recover.
Id. at 959-60, 104 S.Ct. 3405 (emphases added).
In his dissent, Justice Stevens wrote that “[ejourts simply cannot escape them responsibility for redressing constitutional violations ... since the entire point of police conduct that violates the Fourth Amendment is to obtain evidence for use at trial.” Id. at 978, 104 S.Ct. 3405 (Stevens, J., concurring and dissenting). For, “[i]f such evidence is admitted, then the courts become not merely the final and necessary link in an unconstitutional chain of events, but its actual motivating force.” Id. (emphasis added). Nor, according to Justice Stevens, “should we so easily concede the existence of a constitutional violation for which there is no remedy. To do so is to convert a bill of Rights into an unenforced honor code that the police may follow in their discretion.” Id. at 978, 104 S.Ct. 3405.
The Court has since broadened the good-faith exception. In Illinois v. Krull, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the Court applied the exception to cases where an officer conducts a search in objectively reasonable reliance on the constitutionality of a statute that is subsequently declared unconstitutional. 480 U.S. at 346, 107 S.Ct. 1160. Later, in Arizona v. Evans, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), the Court determined that the good faith exception to the exclusionary rule applied to evidence seized incident to the arrest of the defendant based on a warrant that had been quashed seventeen days prior to the arrest. 514 U.S. at 15-16, 115 S.Ct. 1185. According to the Court, the officer making the arrest acted in reliance on an inaccurate computer record indicating existence of an outstanding arrest warrant. Id. at 4-6, 115 S.Ct. 1185. However, because the erroneous information as to the outstanding arrest warrant apparently resulted from clerical errors of court employees, rather than the police, the evidence was not suppressed. Id. at 14-15, 115 S.Ct. 1185.
Then, in Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), the Court expanded the good-faith exception and virtually eliminated Fourth Amendment protections by adopting an elevated standard for applying the exclusionary rule to police misconduct itself. There, incriminating evidence was seized in a search incident to arrest pursuant to an arrest warrant. 555 U.S. at 137-38, 129 S.Ct. 695. Due to an error in police records, however, the arrest warrant had been recalled five months earlier. Id. The defendant argued that because the police did not have a valid *406 arrest warrant, the fruits of the search had to be suppressed.
Herring, however, held that although the police may have been negligent in executing an invalid warrant, police negligence does not trigger suppression under the exclusionary rule. See id. at 140-47, 129 S.Ct. 695. According to the Court, “the exclusionary rule is not an individual right and applies only where it ‘result[s] in appreciable deterrence.’” Id. at 141, 129 S.Ct. 695 (citation omitted). The Court stated that “[e]xclusion” is only justified in cases where there is evidence of systemic recklessness or negligence, such as “reckless[ness] in maintaining a warrant system, or [ ] knowingly [making] false entries to lay the groundwork for future false arrests.” Id. at 146, 129 S.Ct. 695. “When police mistakes are the result of negligence ... rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not ‘pay its way.’ ” Id. at 147, 129 S.Ct. 695.
Thus, the Court employed a cost-benefit test, first used in Leon, holding that in order to “trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price being paid by the justice system.” Herring, 555 U.S. at 142-44, 129 S.Ct. 695. Turning Mapp on its head, the Court held that, unless the rule is used “to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence,” the criminal should not “go free because the constable has blundered.” Herring, 555 U.S. at 145, 148, 129 S.Ct. 695; see also Davis v. United States, — U.S. —, 131 S.Ct. 2419, 2439, 180 L.Ed.2d 285 (2011) (Breyer, J., dissenting) (“The Court’s rationale for creating its new ‘good faith’ exception threatens to undermine well-settled Fourth Amendment law .... if [the Court] would apply the exclusionary rale only where a Fourth Amendment violation was ‘deliberate, reckless, or grossly negligent, then the ‘good faith’ exception will swallow up the exclusionary rule.”).
Thus, on the federal level, the application of the good-faith exception has effectively eliminated any Fourth Amendment protection afforded by the probable cause requirement of the warrant clause and the reasonableness requirement for governmental searches. The safeguards provided by the exclusionary rule have been largely eviscerated. “Herring ... has weakened the exclusionary rule by rendering it inapplicable to ‘police mistakes that are the result of negligence ... [and] foreshadows the elimination of the exclusionary rule altogether.’ ” Claire Angelique Nolasco, et. al., What Herring Hath Wrought: An Analysis of Post-Herring Cases in the Federal Courts, 38 Am. J. Cr. L. 221, 230 (2011) (quoting United States v. Jones, 620 F.Supp.2d 163, 177 (D.Mass.2009)). Moreover, “[i]f the Herring opinion stands for the proposition that all illegally seized evidence will be admissible so long as the police did not act culpably, then the warrant requirement will be significantly weakened, if not nullified .... a general reasonableness standard would govern the Fourth Amendment, and the warrant requirement would not be much of a requirement at all.” Matthew Allan Josephson, To Exclude or Not Exclude: The Future of the Exclusionary Rule After Herring v. United States, 43 Creighton L.R. 175, 196 (2009). “The holding in Herring finds little support in the Chief Justice’s opinion for the majority, which perhaps accurately reflects his apparent longstanding opposition to the exclusionary rule, but is totally unconvincing and in many respects irrelevant and disingenuous.” Wayne R. LaFave, The Smell of Herring: A Critique of the Supreme Court’s Latest Assault on the Exclusionary Rule, 99 J. Crim. L. & Criminology 757, 759 (2009) (citing Adam Liptak, Justices Step Closer to Repeal of Evidence Ruling, N.Y. Times, Jan. 30, 2009, at A1 (noting that back in 1983, Chief Justice Roberts, then a lawyer in the Reagan White House, “was hard at work on what he called in a memorandum ‘the campaign to amend or abolish the exclusionary rule’ ”)).
II.
However, “[s]tate courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the *407 United States Constitution.” Evans, 514 U.S. at 8, 115 S.Ct. 1185. It has long been settled that “as long as we afford defendants the minimum protection required by the federal constitution, we are free to provide broader protection under our state constitution.” State v. Lopez, 78 Hawai'i 433, 445, 896 P.2d 889, 901 (1995) (citing State v. Quino, 74 Haw. 161, 170, 840 P.2d 358, 362 (1992); State v. Texeira, 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967)). Thus, “when the [ ] Supreme Court’s interpretation of a provision present both in the United States and Hawaii Constitutions does not adequately preserve the rights and interests sought to be protected, we will not hesitate to recognize the appropriate protection as a matter of state constitutional law.” State v. Bowe, 77 Hawai'i 51, 57, 881 P.2d 538 544 (1994).
It is established that the Hawaii Constitution provides greater protection for individual liberties than those afforded under the United States Constitution. Article I, section 7 of the Hawaii Constitution states:
The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and persons or things to be seized or the communications sought to be intercepted.”
Haw. Const, art. I, § 7 (emphasis added). This provision of the Hawaii Constitution “provides broader protection than the [FJourth [AJmendment to the United States Constitution because it also [expressly] protects against unreasonable invasions of privacy.” State v. Dixon, 83 Hawai'i 13, 23, 924 P.2d 181, 191 (1996) (emphasis added); see also Torres, 125 Hawai'i at 396, 262 P.3d at 1020 (“[Our exclusionary rule is] unlike the exclusionary rule of the federal government and some other jurisdictions insofar as it guarantees individual privacy rights”); State v. Navas, 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996) (“[A]rticle I § 7 of the Hawaii Constitution [provides a more] extensive right of privacy ... than that of the United States Constitution.”); Lopez, 78 Hawai'i at 445, 896 P.2d at 901 (“Unlike the exclusionary rule on the federal level, Hawaii’s exclusionary rule serves not only to deter illegal police conduct, but to protect the privacy rights of our citizens.”); State v. Tanaka, 67 Haw. 658, 662, 701 P.2d 1274, 1276 (1985) (“In our view, article I, § 7 of the Hawaii Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights.”).
Specifically, “the purpose of ... article I, section 7 is to protect individuals against intrusions by the government.” State v. Kahoonei, 83 Hawai'i 124, 129, 925 P.2d 294, 299 (1996) (emphasis in original). Thus the Hawaii constitution is not limited to protection against police misconduct but “ensure[s] that an individual’s legitimate expectations of privacy will not be subjected to unreasonable governmental intrusions.... The basic purpose ... is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.” Id. (citing State v. Meyer, 78 Hawai'i 308, 311-12, 893 P.2d 159, 162-63 (1995)) (emphasis in original)(emphasis added). This guarantee originates from “our view that the right to be free of ‘unreasonable’ searches and seizures under article I, section 7 ... is enforceable by a rule of reason which requires that governmental intrusions into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary.” Lopez, 78 Hawai'i at 446, 896 P.2d at 902 (citing State v. Kaluna, 55 Haw. 361, 369, 520 P.2d 51, 58-59 (1974)). This view comports with that of the dissenters in Leon, who argued that when courts admit unlawfully seized evidence in a trial, the judiciary becomes part of the governmental action prohibited by the Fourth Amendment. See Leon, 468 U.S. at 954, 104 S.Ct. 3405 (Brennan, J., dissenting, joined by Marshall, J.); Leon, 468 U.S. at 970-77, 104 S.Ct. 3430 (Stevens, J., dissenting) (arguing that since the point of collecting evidence is to use it at trial, if evidence obtained in violation of the Fourth Amendment is not suppressed, courts become the final link and motivating force behind the constitutional violation).
*408 III.
Petitioner/Defendant-Appellee Robert J. McKnight, Jr. (McKnight) argues that the exclusionary rule must apply to the evidence seized from his home on July 6, 2006 because the misdated warrant authorizing the search and seizure was facially invalid. In response, RespondentyPlaintiff-Appellant State of Hawaii (the State) contends that because the warrant stated that it “may be served and the search made on or before July 16.2006, a date not to exceed ten (10) days from the issuance of this search warrant,” and the warrant was in fact issued and executed on July 6, 2006, the warrant was not invalid. (Emphasis added.) However, at the bottom of the search warrant, the warrant stated, “GIVEN UNDER MY HAND, and dated this 6th day of June, 2006, at Wailuku, County of Maui, State of Hawaii.” (Emphases added.)
A
The majority contends that “there is no requirement under the Hawaii constitution, HRS, or HRPP that the issuing judge must write the exact date of issuance on all search warrants.” Majority’s opinion at 382 n. 1, 319 P.3d at 301 n. 1. Respectfully, this is misleading in the context of this case, because HRPP Rule 41© states that “[the warrant] shall command the officer to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified.” HRPP Rule 41© (emphasis added). Thus, although the warrant need not have the exact date of issuance, it must specify a time period for the warrant’s execution.
In stating that there is no requirement for an issuance date to be listed on the warrant, the majority suggests that the date may be inexact as written on the warrant, but the warrant would still be valid. However, this is directly contrary to the requirement of Rule 41© that the warrant specify a “period of time not to exceed 10 days.” This ten day limitation protects against stale warrants, where evidence may have been moved from the places described in the warrant or consumed. Cf. Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887, 890 (1991) (warrant was constitutionally defective and probable cause was lacking where warrant failed to set forth a time frame in which the informants had observed marijuana at the defendant’s residence).[5]
In this case, “the specified period of time” was unclear on the face of the warrant, and thus HRPP Rule 41© was not satisfied, contrary to the majority’s suggestion. The warrant states that it was “Given”, i.e., issued, by the district court on the stated date of June 6, 2006. Under one reading of the warrant, the June date, apparent on the face of the warrant, would indicate that the warrant was valid from June 6, 2006 (“the issuance of this search warrant”) through July 16, 2006. This would directly violate Rule 41©, which states that the specified period of time is “not to exceed 10 days.” Another reading of the warrant would be that it was valid for ten days following the June 6, 2006 date, indicating that the warrant was valid from June 6, 2006 through June 16, 2006. However, as a consequence, the warrant would have been expired on the date of MeKnight’s arrest and the search of his home and vehicle.
*409 Under these circumstances, the warrant cannot be said to have included a “specified period of time” during which a police officer could conduct the search. HRPP Rule 41(b). The warrant was thus clearly invalid. The majority resorts to evidence outside the four corners of the warrant in order to construe it as valid, using the officer’s affidavit. See majority’s opinion at 3. However, a warrant must be regular on its face, so that police know they are authorized to conduct a particular search and the person searched knows that the police are acting under a lawful court order. See United States v. Chadwick, 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (noting that the particularity requirement in a warrant “assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.”) (citations omitted), abrogated on other grounds by California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).[6] To require anything less would be to undermine confidence in the validity of warrants as authorizing government intrusion into an otherwise protected zone of privacy. The majority would require an individual to cede privacy in his or her home when faced with an invalid warrant, despite the fact that “ ‘[pjhysieal entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.’ ” State v. Lopez, 78 Hawai'i 433, 442, 896 P.2d 889, 898 (1995) (quoting United States v. United States District Court Eastern District of Michigan, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)).
Respectfully, by characterizing the error in this case as a “technical” or “scrivener’s” error, the majority depreciates the importance of the warrant requirement. What is at stake is not merely a question of a “scrivener’s error”, but rather, an invasion of a person’s privacy. See State v. Wallace, 80 Hawai'i 382, 393, 910 P.2d 695, 705 (1996) (“The basic purpose of [art. 1, § 7 of the Hawai'i Constitution] is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.”) (citation and internal quotation marks omitted).
The majority’s solution to any inadequacies in the warrant is to look to external evidence, including the supporting affidavit, which, according to the majority “refutes any notion that the search warrant was signed on June 6, 2006.” Majority’s opinion at 394, 319 P.3d at 313. Thus, the majority would require the person searched to, in effect, construe the warrant and the affidavit together to determine if the warrant was valid. Respectfully, this approach amounts to a post hoe justification of a warrant that is obviously invalid on its face. See Groh v. Ramirez, 540 U.S. 551, 557, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (“The fact that the application adequately described the ‘things to be seized’ does not save the warrant from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents.”) (emphases in original) [7].
HRPP Rule 41(d) requires that “[t]he officer taking property under the warrant shall give to the person from whom or from whose *410 premises the property was taken a copy of the warrant and receipt at the place from which the property was taken.” However, there is no requirement for an officer to serve the supporting affidavit, and in this case, the record is not clear as to whether McKnight was given a copy of the affidavit.[8] Under these circumstances, McKnight would have no way of knowing whether the warrant was in fact valid.
First, even assuming that the affidavit was provided to McKnight, by resorting to the use of extrinsic evidence to interpret the warrant’s validity, the majority imposes on parties searched an obligation to interpret conflicting documents and to do so at their peril. The party upon whom the warrant is served is not privy to communications between the police officers and the court, nor usually schooled in judicial interpretation of legal documents. Accordingly, as noted, the warrant must serve to “assure[ ] the individual whose property is searched or seized of the lawful authority of the executing officer,” Chadwick, 433 U.S. at 9, 97 S.Ct. 2476 (citing Camara v. Municipal Court, 387 U.S. 523, 532, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)), not put the individual to an inquiry of the documents.
In this ease, the majority would prescribe a duty on the party searched to construe the warrant “in pari materia” with any supporting affidavits to determine whether the warrant was valid and to ascertain which of the conflicting dates on the face of the warrant should be used to measure the 10 day requirement. Under the majority’s approach, a lay person must therefore interpret multiple legal documents, including an ambiguous warrant, in order to decide whether he or she should accede to a search by police. Respectfully, it would appear painfully obvious that this burden violates the principle that the person upon whom the warrant is served must be informed that there is an adequate basis for the warrant. Therefore, warrants must be plainly valid on their face. See Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (“[Pjosession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct.”).
Second, if McKnight was not provided with the affidavit, then the majority’s approach is even more problematic. On its face, the warrant contains conflicting provisions as to whether it was valid from June 6th through July 16th, or from June 6th through June 16th. Either reading of the warrant would violate HRPP Rule 41(b), as explained above. There are also practical ramifications that arise if a search is conducted pursuant to a facially invalid warrant. For example, in Groh, the Ninth Circuit’s decision noted that “the warrant’s facial defect ‘increased the likelihood and degree of confrontation between the [individuals subject to search] and the police’ and deprived [such individuals] of the means ‘to challenge officers who might have exceeded the limits imposed by the magistrate.’” Groh, 540 U.S. at 556, 124 S.Ct. 1284 (quoting Ramirez v. Butte-Silver Bow County, 298 F.3d 1022, 1029 (9th Cir.2002)); see also Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.12(a) (4th ed. 2004) (having a copy of the warrant allows the person to be searched “know that there is a color of authority for the search, and that he is not entitled to oppose it by force.”) (quoting Model Code of Pre-Arraignment Procedure § 132 (1975)). Therefore, in order to ensure searches are safely and properly executed, warrants must be valid on their face and not conditioned on external documents that may or may not be present at the scene of the search.
Notwithstanding the majority’s arguments as to the interpretation of the dates listed on the face of the warrant, June 6th and July 16, the disposition in this case should have been evident. This jurisdiction had already established, over a decade ago, that a misdated warrant is invalid, and evidence seized as a result must be suppressed. See Endo, 83 Hawai'i at 94, 924 P.2d at 588 (upholding the trial court’s granting of the defendant’s Mo *411 tion to Quash Search Warrant and Suppress Evidence where the police officer wrote the wrong date on the warrant). Cf. State v. Williams, 57 Ohio St.3d 24, 565 N.E.2d 563 (1991) (“The issue presented to this court is whether a search warrant is void ab initio when the face of the document lacks a judge’s signature. We find that it is. Therefore, any evidence obtained pursuant to such a search warrant must be suppressed.”); State v. Surowiecki, 184 Conn. 95, 440 A.2d 798 (1981) (concluding that a search warrant that had not been signed by a judge prior to the search did not issue under Connecticut law). The purpose for this rule, as discussed above, should be self-evident.
B.
As noted before, by affirming the ICA’s decision, the majority implicitly adopts the ICA’s reasoning in its opinion and the ICA’s reversal of Endo, which was the prior prevailing law in this jurisdiction on this issue. See McKnight, 128 Hawai'i at 342, 289 P.3d at 978. Inasmuch as the ICA’s opinion represents a fundamental change in this jurisdiction’s analysis of the exclusionary rule, and the majority has, in effect, affirmed that analysis, the ICA’s opinion is discussed in detail herein.
Prior to the ICA’s decision in the instant case, we held that there are three purposes underlying our exclusionary rule: protection of individual privacy, judicial integrity, and the deterrence of police misconduct. Torres, 125 Hawai'i at 394, 262 P.3d at 1018; see State v. Bridges, 83 Hawai'i 187, 195, 925 P.2d 357, 365 (1996) (“In Hawai'i, we have recognized a number of purposes underlying our exclusionary rule: (1) judicial integrity, State v. Pattioay, 78 Hawai'i 455, 468, 896 P.2d 911, 924 (1995) (“to ensure that evidence illegally obtained by government officials or their agents is not utilized in the administration of criminal justice through the courts”); (2) individual privacy, [Lopez,] 78 Hawai'i at 446, 896 P.2d [at] 902[ ](“to protect the privacy rights of our citizens” [ ]; and, of course); (3) deterrence, Pattioay, 78 Hawai'i at 468, 896 P.2d at 924 (“to deter illegal police conduct”).).
Torres reaffirmed the foundational three purposes of the exclusionary rule in our state. 125 Hawai'i at 394, 262 P.3d at 1018 (“An exclusionary rule analysis requires us to consider the [three] principles served by that rule.”). Torres referenced Lopez to reaffirm the two purposes identified in Lopez, and pointed out that “unlike the exclusionary rule on the federal level, Hawai'i’s exclusionary rule serves not only to deter police misconduct, but to protect the privacy rights of our citizens.”[9] Torres, 125 Hawai'i at 396, 262 P.3d at 1020 (emphasis added) (quoting Lopez, 78 Hawai'i at 445, 896 P.2d at 901). Additionally, Torres plainly mandated that judicial integrity be considered as a third, fundamental purpose in an exclusionary rule analysis. As explained below, in applying Lopez to the instant case and in ignoring Torres, the ICA gravely erred by addressing only two out of the three purposes underlying our state’s exclusionary rule. Respectfully, the ICA was also wrong in concluding that the two purposes it discussed, protection of privacy rights and deterrence, would not be furthered by suppression in this case.[10]
IV.
In its opinion, the ICA held that “misdat-ing of the warrant does not require suppression of the search warrant evidence.” McKnight, 128 Hawai'i at 340, 289 P.3d at *412 976. In so holding, the ICA “overrule[d] [its own] prior decision in [Endo ].” Id. at 342, 289 P.3d at 978. In Endo, under similar circumstances, the ICA held that a misdated search warrant was invalid. 83 Hawai'i at 94, 924 P.2d at 588. There, a police officer misdated a search warrant April 14, 1992, which was submitted for a judge’s signature on May 14, 1992. Id. at 88, 924 P.2d at 582. Endo held that “the Hawaii Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made.” Id. at 94, 924 P.2d at 588.
Eschewing its prior decision in Endo, the ICA, herein, reversed the circuit court, citing Lopez to support its view that neither the deterrence of governmental misconduct nor the protection of the privacy rights of our citizens, “would be furthered by suppressing the evidence seized pursuant to the search warrant.” McKnight, 128 Hawai'i at 341, 289 P.3d at 977. However, neither the majority nor the ICA justify the abrogation of Endo.
Endo is directly on point, and grounds its holding in the protections afforded individual privacy by the Hawaii Constitution both in article I, section 6 and in Hawaii’s counterpart to the exclusionary rule, at article I, section 7. Under our Constitution, in article I, section 6, government intrusion is justified only if “absolutely neeessary[,]” and, “unlike the federal [constitution], article I, section 7 specifically protects against invasions of privacy.” Endo, 83 Hawai'i at 93, 924 P.2d at 583 (quoting Lopez, 78 Hawai'i at 446, 896 P.2d at 902).
Our willingness to afford greater protection of individual privacy rights than is provided on the federal level arises from our view that the right to be free of ‘unreasonable’ searches and seizures under article I, section 7 of the Hawaii Constitution is enforceable by a rule of reason which requires that governmental intrusions into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary. Thus, each proffered justification for a warrantless search must meet the test of necessity inherent in the concept of reasonableness.
Moreover, unlike its federal counterpart, article I, section 7, specifically protects against invasions of privacy.
Although we acknowledge that the Hawaii exclusionary rule serves the valuable purpose of deterring governmental officials from circumventing the protections afforded by the Hawaii Constitution, we now pronounce that an equally valuable purpose of the exclusionary rule under article I, section 7, is to protect the privacy rights of our citizens.
Id. (brackets and alterations omitted) (quoting Lopez, 78 Hawai'i at 445-46, 896 P.2d at 901-02 (emphasis added) (internal quotation marks and citations omitted)). By totally ignoring the precedent set in Endo and the basis for that holding, the majority and the ICA overturn the privacy protections with respect to search warrants provided by the Hawaii Constitution, as discussed in Endo. This contradicts established principles of decision-making to which this court has adhered.
“[A] court should ‘not depart from the doctrine of stare decisis without some compelling justification.’ ” State v. Garcia, 96 Hawai'i 200, 206, 29 P.3d 919, 925 (2001) (internal quotation marks and citations omitted). See also State v. Romano, 114 Hawai'i 1, 11, 155 P.3d 1102, 1112 (2007) (“[A] court should not depart from the doctrine of stare decisis without some compelling justification.” (internal quotation marks and citation omitted)). In this case, there was no discussion whatsoever of the basis for reversing Endo’s reliance on privacy protections provided under the Hawaii Constitution. Thus, there was absolutely no compelling justification for overturning Endo.
A.
Because it relied solely on Lopez and neglected to apply Torres, the ICA’s decision conflicts with precedent.[11] The exclusionary rule preserves judicial integrity by ensuring *413 that courts do not “place their imprimatur on evidence that was illegally obtained by allowing it into evidence....” Torres, 125 Hawai'i at 394, 262 P.3d at 1018 (citing Bridges, 83 Hawai'i at 196, 925 P.2d at 366). As we have held, “if state courts admit[] evidence in a state prosecution that was obtained in a manner that would be unlawful under our constitution, our courts would necessarily be placing their imprimatur on evidence that would otherwise be deemed illegal, thus compromising the integrity of our courts.” Id.; see also Leon, 468 U.S. at 937, 104 S.Ct. 3430 (Brennan, J., dissenting, joined by Marshall, J.) (explaining “seizures are generally executed for the purpose of bringing ‘proof to the aid of the Government ... [thus] the utility of such evidence in a criminal prosecution arises ultimately in the context of the courts, and [ ] the courts therefore cannot be absolved of responsibility for the means by which evidence is obtained.’ ” (internal citation omitted) (emphasis added)).
In this jurisdiction’s view, “[t]he purpose of ... article I, section 7 is to protect individuals against intrusions by the government.” Kahoonei, 83 Hawai'i at 129, 925 P.2d at 299 (emphasis in original). Hence, this court has not agreed with or followed the Supreme Court’s reasoning in Leon to the effect that errors by judges or magistrates are immune to the exclusionary rule because they “are not adjuncts to the law enforcement team” and instead are “neutral judicial officer[s] [who] have no stake in the outcome of particular criminal prosecutions.” Leon, 468 U.S. at 917, 104 S.Ct. at 3417. An error on the date of a warrant renders the warrant invalid irrespective of which governmental hand committed it. As has long been established in this jurisdiction, it is immaterial if it was “the mistake of the officer who applied for it, the judge who signed it, and/or the officer who executed it.” Endo, 83 Hawai'i at 94, 924 P.2d at 588 (emphasis added).
B.
There is no basis in fact, law, or precedent for overturning the foregoing rule as the ICA did, and as affirmed by the majority. In Endo, a police officer mistakenly typed the wrong date on a search warrant that he submitted to a judge for signature, thereby rendering the warrant invalid. Since a mistake could be made by either a police officer or a judge, the ICA considered it necessary to caution judges as well as police officers “not to prepare, sign, and execute facially expired search warrants.” Endo, 83 Hawai'i at 94, 924 P.2d at 588. Endo was correct that the Hawai'i Constitution “does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made.” Id.
Accordingly, a distinction between an error by a judge and an error by police officer, while recognized under the federal constitution, is not constitutionally warranted, under the Hawai'i Constitution. Here, as in Endo, a search conducted pursuant to a search warrant that is facially expired is not valid. An error by the hand of either a police officer or a judge is not excused to the detriment of privacy rights. Under Article I, section 7, this court must abide by a commitment to the “imperative of judicial integrity” because, as stated in Mapp, the failure of government to abide by its own laws is destructive of the rule of law. Mapp, 367 U.S. at 659, 81 S.Ct. 1684. If government does not follow the law, “it breeds contempt for [the] law.” Id. The ICA erred, inter alia, because Torres requires consideration of whether suppression furthers the goal of maintaining judicial integrity, and in this case, for the reasons stated supra, it clearly does.
C.
Unlike the ICA, the majority does in fact consider the “judicial integrity” purpose of the exclusionary rule, Torres, 125 Hawai'i at 394, 262 P.3d at 1018, but its conclusion on this issue summarily assumes that the search warrant was not illegal. The majority states that “there is no harm to judicial integrity in admitting the seized evidence at issue because the mere scrivener’s error in the issuance date did not result in an unreasonable invasion of McKnight’s privacy!,] ” and “[a]e-cordingly, admitting the seized evidence ... in no way compromises judicial integrity.” Majority’s opinion at 399, 319 P.3d at 318.
*414 Respectfully, it is difficult to understand the majority’s belief that the search was not an unreasonable invasion of privacy, since McKnight’s privacy was invaded based on the subject warrant. Maintaining that the warrant was legal assumes that the defendant was bereft of constitutional protections against a warrant that failed to authorize the search of the premises and seizure of the items. Whether the warrant was supported by probable cause and executed within 10 days of July 6, 2006, is not enough to render legal what would be an otherwise invalid warrant. Correspondingly, it does not render legal what would be an otherwise invalid search. Thus, judicial integrity can only be sustained by the suppression of the evidence obtained in the search.
V.
The ICA also erred in its analysis of whether suppression would further the two other purposes of the exclusionary rale, the deterrence of police misconduct,[12] and the protection of individual privacy. The ICA’s analysis in this case adopts the cost-benefit language employed by federal courts rather than Hawaii ease law precedent. The ICA states:
The exclusionary rule imposes a significant and weighty cost on the judicial process and society by requiring the courts to ignore reliable and trustworthy evidence that has a direct bearing on a defendant’s guilt. Where exclusion of the evidence is necessary to further other significant interests, such as deterring government misconduct or protecting privacy rights, the application of the exclusionary rale is justifiable.
McKnight, 128 Hawai'i at 341, 289 P.3d at 977 (emphases added). Although the ICA does not cite to any federal case law, it is clear that its reasoning parallels that from U.S. Supreme Court cases such as Leon, Herring, and Hudson. See, e.g., Leon, 468 U.S. at 906-907, 104 S.Ct. 3405 (“Whether the exclusionary sanction is appropriately imposed in a particular case ... must be resolved by weighing the costs and benefits of preventing the use in the prosecution’s ease.”)[13] Hawaii has not adopted the cost-benefit analysis employed by the U.S. Supreme Court because Hawaii has not rejected but reaffirmed the basis for the exclusionary rale. See Torres, 125 Hawai'i at 396, 262 P.3d at 1020. Thus, the ICA gravely erred when it adopted the federal approach in determining whether the exclusionary rule should be applied in our state and under the Hawaii Constitution.
A.
1.
The ICA decided that suppression would not “deter law enforcement or governmental misconduct.” McKnight, 128 Hawai'i at 341, 289 P.3d at 978. In its brief analysis on this point, the ICA reasoned that “Agent Domingo properly prepared the search warrant [and affidavit], supported by probable cause, which he submitted to a judge for approval.” Id. In effect, the ICA adopts the good faith exception to the exclusionary rale by reasoning, as the U.S. Supreme Court did in Leon, that the evidence need not be suppressed because the officers acted reasonably, and that the fault, if any, for the irregularities in the warrant lay with the court that issued it. See id.
But this ignores and entirely exculpates the police officer or officers who received the warrant from the judge and proceeded to execute it, even though the discrepancy on the face of the warrant should have been obvious to the officers. In the first place, the ICA’s reasoning, as discussed above, is contrary to Hawaii law. This jurisdiction’s *415 precedent plainly rejected the good faith exception to the exclusionary rule.[14] See Lopez, 78 Hawai'i at 446, 896 P.2d at 902. Second, it cannot be said the conduct of the officers was objectively reasonable. It should have been apparent to the officers from the face of the warrant that because of the discrepancy in the dates, the warrant was expired or defective. Thus, it was not objectively reasonable for the officers to rely on the warrant. Seemingly, their conduct would not fall within the good faith exception to the exclusionary rale even were it to apply. For argument’s sake, to the extent, thus, that the ICA holds and the majority affirms that the exclusionary rale would not apply in this case, that holding apparently extends even beyond the good faith exception under Leon.
Additionally, the question on the federal level, where the sole focus under the exclusionary rule is to deter police misconduct, is whether the evidence seized in this case may be admitted under Herring's elevated standard for suppression if the officers were found to be only negligent. However, if the officers knew of the defect but proceeded to execute the search warrant, their conduct would be considered “reckless” and the evidence suppressible under Herring, 555 U.S. at 146-147, 129 S.Ct. 695 (2009). Again, for argument’s sake, the ICA’s position that the evidence should not be suppressed, and the majority’s concurrence, seemingly exceed even the limits drawn by the U.S. Supreme Court in Herring. Id.
Under Hawai'i’s Constitution, the exclusionary rule encourages conscientious police conduct, and mandates a level of awareness that discourages invasion of individual privacy. It is not unreasonable then, to impress upon the police executing the warrant, the importance of reviewing the document to ensure that the warrant is valid. This is necessary because the execution of an invalid warrant results in the invasion of an individual’s right to privacy, whether the invasion arises from a lack of probable cause, or defective warrants, like the one in this case.
Inasmuch as the exclusionary rale generally serves to deter police officers from subsequent misconduct, suppressing evidence in this case would encourage police officers in the future to review warrants prior to executing them. See Endo, 83 Hawai'i at 94, 924 P.2d at 588 (“The [error] may be the mistake of the officer who applied for it, the judge who signed it, and/or the officer who executed it.... [W]e conclude that the Hawai'i Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made.”).
2.
The majority’s analysis with respect to this issue is relatively brief, but it echoes some of the ICA’s problematic reasoning, and would also exculpate the police officer or officers, who received the warrant from the judge and proceeded to execute it, from responsibility in executing a facially defective warrant. See majority’s opinion at 384, 319 P.3d at 303. The majority alleges that “simply stated, no illegal police conduct occurred.” Again, as with its discussion of the judicial integrity rationale, the majority assumes what is in issue—whether the warrant was valid—and assumes that it was, thus concluding that the search was legal.
However, as noted, the police were either (1) negligent in their failure to recognize an obvious discrepancy in the warrant, or (2) reckless in conducting the search even though they knew the warrant contained conflicting dates with respect to its issuance and execution. As discussed, suppressing the evidence obtained in the search would serve to encourage police to ensure a warrant’s facial validity, and discourage them from choosing to ignore a defective warrant and proceeding with a search or seizure anyway.
B.
Manifestly, Hawai'i’s exclusionary rule protects individual privacy rights, as incorporated in article I, section 7 of the Hawai'i Con *416 stitution. Torres, 125 Hawai'i at 396, 262 P.3d at 1020. In Lopez, this court pronounced that the protection of the privacy rights of citizens is a purpose “equally valuable” to that of deterring governmental misconduct. 78 Hawai'i at 446, 896 P.2d at 902. This third purpose underlying Hawai'i’s exclusionary rule, protecting the individual right to privacy, is guaranteed by the Hawai'i Constitution’s unreasonable search and seizure clause and by the express protection for individuals against intrusions by government. See Kahoonei, 83 Hawai'i at 129, 925 P.2d at 299.
1.
As to this purpose, the ICA held that “the suppression of the search warrant evidence [in this case] would also not serve to protect the privacy rights of our citizens.”[15] McKnight, 128 Hawai'i at 341, 289 P.3d at 977. According to the ICA, suppression of the evidence “would only serve to benefit those who were validly subject to search, but by pure fortuity happened to draw an issuing judge who made a clerical error in signing the warrant.” Id. at 341-42, 289 P.3d at 977-78.
First, this contention is circular because it assumes what is at issue, i.e. that government “entitlement to search MeKnight’s residence” was “established.” But whether the government was entitled to search in the first place rests on the question of whether the warrant was valid under our law. If not, then the warrant did not authorize, i.e. “entitle,” the police to enter the premises.
Since, in this ease, the warrant was facially defective, the police did not have authorization to search McKnight’s home, and thus there can be no question that the search invaded McKnight’s privacy. “The sanctity of one’s abode has been embedded in our common law tradition even before the origins of our nation.” State v. Harada, 98 Hawai'i 18, 41, 41 P.3d 174, 197 (Aeoba, J., concurring in part and dissenting in part) (citation omitted). Obviously, then, “governmental agents [were not] clearly [entitled] to seareh[.]” McKnight, 128 Hawai'i at 341, 289 P.3d at 977.
Further, this court has not viewed the proper issuance of a warrant as depending on whether or not a particular circumstance was “draw[n]” to the benefit or disadvantage of the defendant or the police, as the ICA posits. Respectfully, such a view evinces an hostility to the protection of privacy rights. The privacy right cannot be demeaned by minimizing its invasion as simply a matter of drawing the wrong judge. The defect in a search warrant may result from any number of causes. The fundamental question is whether the warrant is valid;' if it is not, our constitution and case law bar evidence derived from its execution as the most effective way to protect the personal right of privacy. See Kahoonei, 83 Hawai'i at 132, 925 P.2d at 302. In a larger sense, the benefit from the exclusionary rule redounds to all: everyone benefits from the vigilant protection of constitutional rights and from maintaining the rule of law.[16]
2.
With respect to individual privacy rights, the majority concludes that suppression would not serve to protect those rights. Majority’s opinion at 383, 319 P.3d at 302. The majority joins in the ICA’s contention that “the search would not have been conducted in a different manner or time had the court written the correct issuance date on the ju-rat!,]” and so no greater invasion of McKnight’s privacy occurred as the result of the error. Id. at 383, 319 P.3d at 302. Thus, *417 the majority would uphold the warrant, so long as the result would not have been different with respect to the search itself.
However, first, this conclusion allows police to ignore mandates with respect to what a valid warrant must contain, including the requirement of HRPP Rule 41 that the warrant “shall command the officer to search, within a specified period of time not to exceed 10 days[.]” HRPP Rule 41© (emphasis added). As noted, the warrant in this ease did not accurately specify a period of time during which the officers could conduct the search.
Second, the specifications for what must be contained in a warrant are an extension of the warrant requirement’s basic protection of the right of privacy. Thus, in conducting a search pursuant to a warrant that does not meet those specifications, the government violates that right. Had the correct date been on the warrant in the instant case, then there would have been no such invasion. However, here, contrary to the majority’s conclusion, there was in fact an invasion of the right to privacy that should not have occurred.
Moreover, the majority adopts the ICA’s argument that suppression only benefits those validly subject to search, but for fortuitously having a judge who made a clerical error. Majority’s opinion at 383, 319 P.3d at 302 (quoting McKnight, 128 Hawai'i at 341-42, 289 P.3d at 977-78). Respectfully, this is a view that undermines the value of privacy rights. The fundamental question is whether the warrant is valid. The requirement that the police have a valid warrant—inclusive of all the required information and with the requisite underlying probable cause—serves to ensure that searches are conducted only when the appropriate protections are in place in order to preserve the right to privacy. The majority’s reference to this error as a “mere clerical error” ignores the consequences of such an error, that of depriving McKnight of the right to privacy under our case law, inasmuch as such an error is not inconsequential in its effect. See Endo, 83 Hawai'i at 94, 924 P.2d at 581.
VI.
In support of its holding, the majority and the ICA cite cases from other jurisdictions.[17] Majority’s opinion at 384, 319 P.3d at 303; see also McKnight, 128 Hawai'i at 342, 289 P.3d at 978 (citing State v. Dalton, 132 Or. App. 36, 887 P.2d 379 (1994) and State v. Steffes, 269 Mont. 214, 887 P.2d 1196, 1210 (1994)). However, Endo specifically rejected Dalton and Steffes, cited by both the ICA and the majority in this ease. See Endo, 83 Hawai'i at 94 n. 7, 924 P.2d at 588 n. 7. In distinguishing those eases, Endo emphasized, among other things, “the uniqueness of Hawaii’s Constitution [and] the specificity requirements imposed by HRPP Rule 41©” in concluding that “the Hawai'i Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made.” Id. at 94, 924 P.2d at 588. As noted, neither the ICA nor the majority set forth any rationale for why Endo’s holding with respect to the unique privacy protections under the Hawai'i Constitution should be overturned.
Indeed, Dalton, Steffes, and the remaining cases cited by the majority are unpersuasive inasmuch as this court has independently analyzed the protections for individual liberties provided under the.Hawai'i Constitution. See Torres, 125 Hawai'i at 396, 262 P.3d at *418 1020 (“[I]t would seem apparent that the question of whether or not the privacy rights of a defendant who is tried in our courts and under our penal law have been violated, should not be governed by the law and constitution of jurisdictions that have deemed privacy rights irrelevant.”)- As stated, the Hawaii Constitution provides that “[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated[.]” Haw. Const, art. I, § 7 (emphasis added).
For example, the Oregon Constitution contains no such language regarding the right to privacy. See Or. Const, art. I, § 9. Thus, the majority’s citation to Dalton and State v. Radford, 223 Or.App. 406, 196 P.3d 23, 26 (2008), two Oregon cases, is inapposite on this basis alone.[18] The majority’s citation to Heard v. State, 272 Ark. 140, 612 S.W.2d 312 (1981), see majority’s opinion at 384, 319 P.3d at 303, is inapposite for the same reason, in that the Arkansas Constitution similarly does not contain an explicit right to privacy. See Ark. Const, art. II, § 16.
The majority also cites to a ease from South Carolina, State v. Shupper, 263 S.C. 53, 207 S.E.2d 799, 800-01 (1974), a case from Louisiana, State v. E.J.F., 999 So.2d 224, 231-32 (La.Ct.App.2008), and a case from Illinois, People v. Deveaux, 204 Ill.App.3d 392, 149 Ill.Dec. 563, 561 N.E.2d 1259, 1263-64 (1990), in support of its position. Majority’s opinion at 384-86, 319 P.3d at 303-05. Unlike Hawaii, however, the “good faith” exception is recognized in South Carolina, Louisiana, and Illinois.[19] The fact that these states recognize the good faith exception only highlights the majority’s departure from the jurisprudence in Hawaii with respect to the warrant requirement, and emphasizes that case law from those jurisdictions should not be followed in this court’s consideration of the instant ease.
Finally, Montana’s constitution does contain a constitutional provision recognizing the right to individual privacy, see Mont. Const, art. II, § 10, which has been interpreted to “yield to a compelling state interest!,]” which “exists where the state enforces its criminal laws for the benefit and protection of other fundamental rights of its citizens.” State ex rel. Zander v. District Court, 180 Mont. 548, 591 P.2d 656, 660 (1979). However, in Stejfes, the Montana court’s conclusion that the search warrant was valid stemmed from a Montana statute specifically providing that no search and seizure shall be illegal if “any irregularities in the proceedings do not affect the substantial rights of the accused.” 887 P.2d at 1210 (quoting Mont.Code Ann. § 46-5-103 (1989)). While it is true that statutes cannot override constitutional protections, by citing to the Montana statute in Stejfes, the Montana court effectively construed the privacy protection in Montana’s Constitution to *419 afford protections only to the extent provided by the statute. In contrast, Endo construed Hawaii’s similar constitutional provision as providing greater protections to its residents. 83 Hawai'i at 94, 924 P.2d at 588 (“[W]e concluded that the Hawaii Constitution does not permit the validation of searches pursuant to search warrants that are facially expired when the searches are made.”). Thus, as noted, Endo explicitly rejected Steffes. Id.
With respect to the consideration of these ancillary cases, it is worth reiterating that court is the “ ‘ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawaii Constitution^]’ ” State v. Viglielmo, 105 Hawai'i 197, 211, 95 P.3d 952, 966 (2004) (quoting State v. Arceo, 84 Hawai'i 1, 38, 928 P.2d 843, 870 (1996) (quoting State v. Wallace, 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996) (quoting State v. Hoey, 77 Hawai'i 17, 36, 881 P.2d 504, 523))). Consequently, the jurisprudence of these varying jurisdictions has been rejected in connection with this court’s final determination of the issue before us.
VIL
Adopting the good faith exception, as the ICA seems to suggest in its opinion and as affirmed by the majority, would undermine the three purposes of article I, section 7. Endo declared that “unlike its federal counterpart, article I, section 7, specifically protects against Invasions of privacy.’” 83 Hawai'i at 93, 924 P.2d at 587. The right to be free from unreasonable searches and seizures is a personal right under the Hawaii Constitution. See Lopez, 78 Hawai'i at 446, 896 P.2d at 902. The good faith exception would thus abrogate the strong privacy protections embodied in our constitution. See Torres, 125 Hawai'i at 396, 262 P.3d at 1020.
The exclusionary rule also serves to encourage officers to be careful in not only the preparation, but also the execution of search warrants. As Endo states, this court must consider “the desire to motivate the officials who prepare, sign, and execute search warrants not to prepare, sign, and execute facially expired search warrants.” 83 Hawai'i at 94, 924 P.2d at 588. If officers were able to rely on the good faith exception, they would have no legal incentive to ensure the validity of a warrant, for, under the majority’s and the ICA’s view, issuance by a judge itself may be enough to excuse any mistake on the face of the warrant.[20]
Finally, as noted supra, allowing the use of illegally seized evidence can only undermine the integrity of the judiciary. Adopting the good faith exception would leave individuals whose constitutional rights have been violated without a judicial remedy, transforming article I, section 7 into a meaningless provision. In this case, none of the purposes supporting the exclusionary rule were served. As in Kahoonei, “to hold otherwise would needlessly erode one of the fundamental objectives of ... article I, section 7 of the Hawaii Constitution, that is, to deter government agents from bypassing the warrant requirement.” Kahoonei, 83 Hawai'i at 132, 925 P.2d at 302.
VIII.
In light of the foregoing, I would hold that the warrant in this case was invalid, and in confirmation of the purposes behind the exclusionary rule, that the evidence obtained pursuant to the warrant must be suppressed.

. Significantly, Tones was decided before the ICA’s opinion in State v. McKnight, 128 Hawai'i 328, 289 P.3d 964 (App.2012), was issued, yet was not cited by the ICA.

. The Fourth Amendment to the United States Constitution states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV.

.The Supreme Court had held that ”[i]f letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure *404 against such searches and seizures is of no value, and ... might as well be stricken from the Constitution.” Mapp, 367 U.S. at 647, 81 S.Ct. 1684 (citing Weeks, 232 U.S. at 393, 34 S.Ct. 341).

. Leon stated that "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police least negligent, conduct, which has refusing to admit evidence gained as to instill in those particular investigating officers, or in their the very right. By courts hope future counterparts, a greater degree of care toward the rights of an accused.” 468 U.S. at 919, 104 S.Ct. 3430 (citing Michigan v. Tucker, 417 U.S. 433, 447, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)). See also United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ("|T]he primary purpose of the exclusionary rule is to deter future unlawful police conduct”); United States v. Peltier, 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) ("[T]he purpose of the exclusionary rule is to deter unlawful police conduct ...”).

. In connection with this reference to the Ed-munds case, the majority observes that in a separate Pennsylvania case, Commonwealth v. Benson, 10 A.3d 1268 (Pa.Super.Ct.2010), the Pennsylvania Superior Court held that the "technical” defect present in a warrant did not render it invalid. Majority's opinion at 395 n. 19, 319 P.3d at 314 n. 19 (citing Benson, 10 A.3d at 1274). However, the citation herein to a Pennsylvania case, Edmunds, is not for the purpose of suggesting that Hawaii comprehensively adopt that state's search and seizure jurisprudence. Instead, Edmunds is simply illustrative of the tenet that warrants may become stale if time limitations are not established and enforced. See Edmunds, 586 A.2d at 890.
Furthermore, in Edmunds, the issue was not that the affidavit lacked "requisite facts”, but rather that the "warrant failed to set forth a time frame in which the informants had observed marijuana." 586 A.2d at 890 (emphasis added). Thus, Edmunds pertains to defects that arise because of erroneous dates. Moreover, in Benson, the Pennsylvania court required that where there was a mis-dating on the warrant, the warrant would only be invalid if the defendant could show prejudice. 10 A.3d at 1274. This position was rejected in Endo, where, interpreting the Hawaii Constitution, it was held that a mis-dating on the warrant resulted in invalidation without the defendant having to show prejudice. Endo, 83 Hawai'i at 94, 924 P.2d at 588.

. The U.S. Supreme Court has established that "If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached.... If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, [the Supreme Court!, of course, will not undertake to review the decision. Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). This opinion rests on "bona fide separate, adequate, and independent grounds” under the Hawai'i Constitution, and federal cases obviously "do not ... compel the result” this opinion reaches. See id.; see also Arizona v. Evans, 514 U.S. at 8 (“We believe that Michigan v. Long properly serves its purpose and should not be disturbed. Under it, state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution.”).

. Although the U.S. Supreme Court in Groh allowed for the possibility that a warrant may incorporate other documents by reference, it noted that such documents must accompany the warrant. Groh, 540 U.S. at 558, 124 S.Ct. 1284. As noted, in this case it is not clear from the record whether the affidavit was provided to McKnight.

. It is not clear from the record if anyone was present at McKnight's home at the time the warrant was executed. McKnight was in custody on that date, and had indicated that he lived with his mother and sister. This would not affect our analysis, inasmuch as the evidence seized was ultimately used against McKnight.

. The majority states that "[n]otably,” McKnight initially argued that there were insufficient facts to establish probable cause to issue the search warrant, and only later argued that the search warrant was facially invalid. Majority's opinion at 382-83, 319 P.3d at 301-02. It is not clear why this is relevant. If the search warrant was invalid, either because of a lack of probable cause or because of an error on the face of the warrant, the evidence seized pursuant to that warrant should be suppressed, as the circuit court ordered.

. The majority holds that "the only basis to suppress the evidence obtained pursuant to the search warrant in this case would be the issuing judge’s typographical error.” Majority's opinion at 398, 319 P.3d at 317. The error on the search warrant in this case cannot be characterized as a "typographical error.” Inasmuch as the date was handwritten, it was not the result of a typographical error, but plainly that of the issuing judge's act.

. This section also responds to the State’s argument that the ICA’s decision does not compromise the integrity of our judiciary.

. This section also responds to the State’s argument that the ICA's decision does not undermine the exclusionary rule’s goal of deterring police misconduct.

. See also Herring, 555 U.S. at 141, 129 S.Ct. 695 (" '[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.’ ”) (quoting Illinois v. Krull, 480 U.S. 340, 352-353, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (internal quotation marks omitted)); Hudson, 547 U.S. at 596, 126 S.Ct. 2159 ("Next to these 'substantial social costs' we must consider the deterrence benefits, existence of which is a necessary condition for exclusion.”).

. See also State v. Matsunaga, 82 Hawai'i 162, 168, 920 P.2d 376, 382 (App.1996) (explaining that the Hawai'i Supreme Court appeared to reject the good faith exception in Lopez, 78 Hawai'i at 446, 896 P.2d at 902, and that if Hawai'i did recognize the good-faith exception rule, it would not apply to the facts of the case). See Torres, 125 Hawai'i at 396, 262 P.3d at 1020.

. This section also responds to the State's argument that the ICA’s decision does not undermine the goal of protecting the privacy rights of our citizens.

. The exclusionary rule serves to uphold the basic historical tenet of privacy in one's own home:
"The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail—its roof may shake—the wind may blow through it—the storm may enter, the rain may enter—but the King of England cannot enter— all his force dares not cross the threshold of the ruined tenement!”
Harada, 98 Hawai'i at 40, 41 P.3d at 196 (Acoba, J., concurring) (quoting Frank v. Maryland, 359 U.S. 360, 378-79, 79 S.Ct. 804, 3 L.Ed.2d 877, (1959) (Douglas, J., dissenting) (other citations omitted)).

. The majority also cites to the opinion of the Ninth Circuit Court of Appeals in support of its holding that "scrivener’s errors” do not render a search warrant invalid. Majority's opinion at 395-96 n. 21, 319 P.3d at 314-15 n. 21 (citing United States v. Hitchcock, 286 F.3d 1064, 1072 (9th Cir.2002)). As explained at length supra, it is axiomatic that the Hawai'i Constitution provides greater protections for individual liberties than the Fourth Amendment to the United States Constitution. See Dixon, 83 Hawai'i at 23, 924 P.2d at 191 (1996). Moreover, the Ninth Circuit states that "[t]he good faith exception has no application ... where there is no dispute about the search warrant's validity.” Hitchcock, 286 F.3d at 1072. However, under Hawaii's jurisprudence, where a warrant is misdated, as here, there is a dispute about the search warrant’s validity. Hitchcock, however, adopts a position similar that of the other states' decisions cited by the majority, infra, that are rejected herein. Inasmuch as this court is interpreting the bill of rights of the Hawai'i Constitution in this case, federal cases are not controlling or persuasive.

. Furthermore, Daltons holding that the inadvertent misdating of the warrant "did not frustrate the constitutional objective served by the statutory requirement that search warrants be dated and executed within five days of their issuance[,]” 887 P.2d at 379, was in connection with a constitution that does not contain a specifically articulated right to privacy. Further, in Radford, although the Oregon court noted that there was "no explicit constitutional requirement for a particularized date ...,” 196 P.3d at 26, there was also, significantly, no constitutional provision in the Oregon Constitution regarding the right to privacy.

. See State v. Covert, 368 S.C. 188, 628 S.E.2d 482, 487 (S.C.Ct.App.2006) (noting that the South Carolina Supreme Court recognizes the good faith exception); State v. Maxwell, 38 So.3d 1086, 1091-92 (La.Ct.App.2010) ("In any event ... even if the warrant were to found to be deficient, the seized evidence may nevertheless be admissible under the good-faith exception of Leon."); People v. Tunnage, 162 Ill. 299, 310 (Ill.1994) (applying the U.S. Supreme Court’s good-faith analysis from Leon). The majority asserts that these citations, illustrating that South Carolina, Louisiana, and Illinois have adopted the "good faith” exception, "involve an application of a "good faith” exception analysis only after determining that the warrant was invalid. Majority's opinion at 395 n. 21, 319 P.3d at 314 n. 21.
However, our jurisprudence clearly establishes that the warrant in this case was per se invalid because it was mis-dated. See Endo, 83 Hawai'i at 94, 924 P.2d at 581. Thus, in our jurisdiction, upholding a mis-dated warrant would constitute an application of the "good faith” exception where it has been previously rejected. Ultimately, how the "good faith” exception is applied or formulated in other jurisdictions is irrelevant, since, as noted, Endo would hold the warrant was invalid. See id. at 93-94, 924 P.2d at 581—82.

. See also State v. Guzman, 122 Idaho 981, 842 P.2d 660, 671-72 (1992) (holding that one of the purposes of the exclusionary rule is to ensure police officers carefully review warrants).